**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Allen G. ELLSWORTH, Defendant-
Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Juan DE LA TORRE, Defendant-
Appellant.**

**Nos. 72–2735, 72–2992.**

United States Court of Appeals,
Ninth Circuit.

June 15, 1973.

Rehearing Denied in No. 72–2735
July 31, 1973.

S. Thomas Pollack, Deputy Federal Public Defender (argued), Los Angeles, Cal., for Allen G. Ellsworth.

Roger S. Hanson (argued), Beverly Hills, Cal., for Jaun De La Torre.

Mike Kenney, Asst. U. S. Atty. (argued), William D. Keller, U. S. Atty., Leslie E. Osborne, Eric A. Nobles, William R. Hawes, Asst. U. S. Attys., Los Angeles, Cal., for plaintiff-appellee.

Before KOELSCH and TRASK, Circuit Judges, and HARRIS,* District Judge.

GEORGE B. HARRIS, District Judge:

On May 17, 1972, appellants and others were named in a six-count indictment charging conspiracy to distribute a controlled substance and substantive offenses of distribution of a controlled substance. Appellants were each charged in Count I only, the conspiracy count. Following trial by jury, appellants were convicted.

The facts pertinent to these appeals are as follows: One Rip Palmer, who was employed by appellant Ellsworth at American-Balboa Glass in Costa Mesa, California, became aware sometime before March of 1972 that two of the other co-defendants, Aragon and Lovato, were engaged in the sale of narcotics. Palmer, who had a prior criminal record, thereupon contacted the Costa Mesa Police Department and offered to serve as an informant.

During March, Palmer, acting as an informant, met with Aragon and Lovato for the purpose of discussing possible sales of heroin and cocaine. Near the end of March, Aragon gave Palmer a sample of heroin to present to his (Palmer's) "people." A meeting between Aragon, Palmer, and undercover narcotic agents occurred on March 28 at which time future sales of heroin were discussed. There was a sale of heroin at that time.

A meeting took place on April 6 at the American-Balboa Glass Company between Lovato, Palmer, and two undercover agents for the purpose of arranging a future sale.

Another meeting between Lovato, Palmer, and the undercover agents occurred on April 11 at the Age of Gardner Restaurant. After making arrangements from the restaurant to pick up narcotics from his supplier, Lovato left, later to return with the narcotics, at which time a sale was consummated.

The next sale occurred approximately on April 19 at the El Comedor Restaurant. Palmer testified that during negotiations for this sale Lovato said that he had to call his "connections" and subsequently he dialed telephone number 543–9302 and asked for "Juanito or Doroteo." Palmer also testified that after the phone call, Lovato left to pick up the narcotics.

A Government witness at trial identified telephone number 543–9302 as being that of the El Valle Restaurant in Garden Grove, California. This restaurant was owned by one Doroteo De La Torre,

---

* Honorable George B. Harris, Senior United States District Judge, Northern District of California, sitting by designation.

and appellant Juan De La Torre was employed there at the time.

Another Government witness, Agent Larry Barnes of the Federal Bureau of Narcotics and Dangerous Drugs [BNDD], testified that at the time of the April 19 sale, he observed appellant De La Torre operating the cash register and performing other duties in the restaurant. After the restaurant closed, Barnes observed Lovato meet with appellant De La Torre and hand him a roll of American currency.

Other evidence adduced at trial showed that on April 11, 1972, a date when narcotics transactions involving the conspirators were taking place, Officer Casey of the Costa Mesa Police Department observed Lovato visit appellant De La Torre and the El Valle Restaurant. Agent Levesque of BNDD testified that on March 28, 1972, a date when Aragon was engaged in a narcotics transaction, he surveilled Aragon going to and from the El Valle Restaurant.

On April 27, Aragon met with Agent Creason of BNDD for the purpose of negotiating a sale of heroin. Arrangements for delivery of the heroin were made on May 1 and the sale of 113 grams of heroin was consummated on May 2 between Aragon and Agent Creason. Following this sale, surveillance officers observed Aragon delivering a sum of money to appellant De La Torre at Aragon's El Comedor Restaurant.

On May 4, Agent Creason met with Aragon at the Holiday Inn in Los Angeles to discuss the quality of heroin Aragon had sold to Creason on May 2 and possible future transactions.

When Aragon arrived at the meeting he was accompanied by appellant Ellsworth, who was introduced to Creason as Aragon's source of supply for narcotics. Creason indicated that he was dissatisfied with the quality of heroin sold to him on May 2 and that he was not going to pay for it. Ellsworth then said that he had purchased and supplied to Aragon the four ounces of heroin purchased on May 2. Ellsworth also stated

that he had purchased the heroin from his source with the understanding that it had not been "stepped on" or diluted.

Upon learning for the first time that Ellsworth was Aragon's source of supply, but suspecting that this was not true, Creason expressed his disbelief that Ellsworth was in fact Aragon's source of supply for the heroin sold him on May 2. Confronted with Creason's disbelief, Ellsworth nonetheless insisted that he was indeed Aragon's source of supply and that he had supplied him with the heroin which Creason had purchased on May 2. Later, however, when Ellsworth was not present, Aragon told Creason that he was merely passing off Ellsworth as his source for the heroin sold on May 2.

When Ellsworth was again present, Creason complained about the quality of the heroin purchased on May 2. Both Ellsworth and Aragon promised that they would attempt to provide him with higher grade heroin in the future, and boasted of the ability to deliver multi-kilogram quantities of narcotics. Arrangements were then made for the sale of narcotics on May 8, 1972. Catalina was agreed upon as the place of delivery because defendant, who volunteered that he was a pilot, could fly the narcotics there.

On May 8, Creason talked to Aragon about the proposed transaction discussed at the May 4 meeting. Alternative plans were made. Aragon said that he had a substantial quantity of heroin at his restaurant and that Creason should come there to get it. Creason went to the restaurant where Aragon and acquitted defendant Hernandez were present. The sale was consummated and the defendants thereafter arrested.

## ELLSWORTH

Ellsworth raises several issues on appeal, each of which will be discussed.

### 1. *Scope of Examination*

At trial, Ellsworth testified on direct examination that he took part in the meeting with Agent Creason on May 4,

but contended that he did so only out of curiosity and to back up his friend, Aragon. He also disclaimed knowledge of the conspiracy, stating:

> Q. At any time prior to that May 4 meeting, did you meet with anybody, any of the agents who have testified here or any of the other defendants for the purpose of engaging in the sale of narcotics?
>
> A. No.

On cross-examination by Government counsel, the following similar colloquy occurred:

> Q. Did you in response to Mr. Pollack [defense counsel] say that you had never discussed narcotics with any BNDD agent or anyone other than Mr. Creason on May the 4th?
>
> A. To the best of my knowledge, yes.
>
> Q. And you in fact said that to Mr. Pollack?
>
> A. I believe that was his statement.
>
> Q. Do you know Mr. Larry Barnes?
>
> A. No sir, I do not.
>
> Q. Do you recall Agent Barnes testifying here, yesterday?
>
> A. Oh, yes. Excuse me.
>
> Q. Have you ever seen Mr. Barnes before?
>
> A. Not to my knowledge, no.
>
> Q. Do you recall meeting Mr. Barnes on March the 15th?

At this point defense counsel objected, claiming that the inquiry was beyond the scope of the conspiracy charged. The district court ruled, however, that with a proper foundation as to Ellsworth's understanding of the term "narcotics," the question was proper cross-examination.

After such a satisfactory foundation was established, Government counsel proceeded to cross-examine Ellsworth. Ellsworth could not recollect whether he had discussed marijuana on March 15th with Agent Barnes and could not even

recollect Barnes. He admitted that he might have engaged in "idle chatter" with Aragon concerning the importation of marijuana, but reaffirmed that he did not know Agent Barnes.

In rebuttal, Agent Larry Barnes of the BNDD stated that he knew Ellsworth because he had met with him on March 15, 1972, to discuss the possible smuggling of marijuana into the United States.

■ This impeachment of Ellsworth was proper. The court permitted cross-examination of Ellsworth concerning the denial of any previous dealings with narcotics only after it was satisfied that Ellsworth considered marijuana an illegal substance. Once this foundation was established, Government counsel could properly cross-examine Ellsworth concerning conversations prior to May 4, 1972, as to the importation of marijuana because defense counsel had "opened the door" on direct examination of Ellsworth.

In addition, such testimony was admissible for impeachment as an earlier inconsistent statement.

2. *Disclosure of Exculpatory Material*

■ Ellsworth contends that subsequent to trial his counsel learned for the first time that Officer Casey of the Costa Mesa Police Department, who was an investigator in the case and a Government witness, was of the opinion that Ellsworth was not conspiring to sell heroin, had not in fact sold heroin, and had been tied into the charged offense by reason of doing a favor for a friend (Aragon). This information was raised in support of the motion for new trial, both as new evidence and as evidence that the Government failed to comply with the disclosure requirements of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). The motion was denied by the district court.

In addition, a post-trial letter to the court from the United States Probation Officer, read by the court at the time of the hearing on Ellsworth's motion for

new trial, included a statement of the probation officer that Agent Casey was convinced that Ellsworth was not a dealer in heroin and that his involvement in the offense was limited to doing a favor for a friend.

Ellsworth now argues that Casey's belief was information known to the Government prior to trial and which should have been produced by it but was not, thereby violating due process and requiring a new trial for Ellsworth.

Prior to trial, the Government's opposition to Ellsworth's motion for Bill of Particulars included an affidavit in which it was represented that the Government had no evidence favorable to Ellsworth and material to his guilt or punishment. Prior to trial, the Government also represented to the court that it did not possess any Costa Mesa Police Department reports and did not know that any existed.

Officer Casey had no direct contact with Ellsworth because his part in the investigation did not include participation in the May 4, 1972, meeting at which Ellsworth met with Aragon in negotiations for the sale of narcotics.

During the course of the trial certain documents prepared by Officer Casey in connection with his investigation were submitted to the district court in camera. The district court ruled that they contained no information that was exculpatory and material to Ellsworth's guilt or innocence.

Moreover, the letter from the probation officer indicated that it was Casey's feeling that Ellsworth's involvement was limited to exactly what he was convicted of. Although the probation officer recommended a split sentence, Ellsworth was instead placed on probation for five years.

Ellsworth has not carried his burden under the cases to show that material was suppressed and that therefore he should be granted a new trial. There has been no showing that any material was suppressed by the Government nor that information bearing on the extent of Ellsworth's involvement was withheld at the time of sentencing.

In addition, it is not clear that Ellsworth did not know about Casey's opinions earlier, and, in any event, Casey's opinions were just that—he did not have first-hand knowledge since he was not present at the May 4, 1972, meeting involving Ellsworth.

**3. _Joinder_**

Ellsworth claims that the district court erred in not granting his motion for new trial on the ground of a fatal variance between the one general conspiracy charged in the indictment and the proof at trial of several distinct conspiracies. This defense stems from the decision in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The test here is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy; if so, there is a single conspiracy. _Cf._ Hernandez Cases, Nos. 71–2082 to 71–2090, 71–2093 to 71–2096, 71–2140, 71–2141, 71–2153 (9th Cir. Feb. 16, 1973). Although the proof of Ellsworth's guilt was not strong, it was more than adequate to sustain a conviction, and such conviction carried with it the implied finding that, contrary to his testimony, Ellsworth knew or had reason to know of the existence of the charged conspiracy and its object. That Ellsworth may not have known the precise identities of the other principals is not relevant. United States v. Projansky, 465 F.2d 123, 135 (2d Cir. 1972), cert. den., 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972).

To the extent that Ellsworth complains about "guilt by association," the district court obviated such problem through the giving of certain adequate cautionary instructions to the jury.

**4. _Severance_**

Ellsworth's strongest contention is that the district court erred in not granting his pre-trial motion for severance. Ellsworth based this motion on

the statement that co-defendant Aragon would provide exculpatory testimony for Ellsworth at a second and separate trial for Ellsworth, but not at the joint trial where he remained a co-defendant. Under the circumstances of a joint trial, of course, counsel for Ellsworth could not call Aragon to the stand.

At a pre-trial hearing Aragon testified that he would, in fact, testify for Ellsworth at a separate trial for the latter. At the hearing on the motion for new trial Aragon again testified, corroborating the testimony given by Ellsworth at trial. Ellsworth claims that the prejudice of Ellsworth's joinder more than outweighed the inconvenience of separate trials, since, in his estimation, only Agent Creason would have had to testify for the Government at a separate trial for him.

Under the facts of the case, joinder was proper pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure. The issue, then, is whether such joinder was so prejudicial to Ellsworth's rights as to require the district court to exercise its discretion and grant severance.

The Government relies on United States v. Hutul, 416 F.2d 607, 620 (7th Cir. 1969), cert. den., 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970) for the propriety of denying a motion for severance in a conspiracy trial where the severance is sought to enable a defendant to call codefendants as witnesses for the defense. In *Hutul*, however, there was no showing that the co-defendants would in fact so testify and, since the Fifth Amendment would shield them from forced testimony, severance was denied.

Although the Ninth Circuit decisions on the matter seem to indicate that severance is mandated only where there is an adequate showing that the co-defendant is in fact to be called at the movant's separate trial and would in fact testify for him, the distinction in the present case is predicated on the fact that the district court was of the opinion that Aragon's testimony, if any, would merely corroborate Ellsworth's

conviction rather than tend to exculpate him.

Ellsworth relies on United States v. Echeles, 352 F.2d 892 (7th Cir. 1965), but that is a stronger case; the co-defendant whose testimony was claimed to make a separate trial of the moving defendant necessary had already given exonerating testimony in court on three occasions immediately prior to trial and, in addition, certain evidence was admissible against him but not the moving defendant.

The standard to be followed here was recently summarized in United States v. Berlin, 472 F.2d 13, 15 (9th Cir. 1973):

> Under Fed.R.Crim.P. 14, denial of a motion for severance will be reversed on appeal only if it constituted an abuse of discretion. [Citing cases.] Such abuse exists when the joint trial was manifestly prejudicial. [Citing cases.]

■ Here, particularly in view of the district court's finding that Aragon's proffered testimony would not be exculpatory, the denial of the motion for severance was not an abuse of discretion.

## DE LA TORRE

De La Torre also raises several issues on appeal, but these are all without merit.

### 1. *Hearsay Statements*

De La Torre claims that the district court violated his rights under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) by permitting the introduction into evidence of co-conspirators' hearsay statements. De La Torre is incorrect here.

■ A well-recognized exception to the rule against the admission of hearsay is that for co-conspirators. *See* United States v. Brooks, 473 F.2d 817, 818 (9th Cir. 1973). Under Carbo v. United States, 314 F.2d 718, 735 n.21 (9th Cir. 1963), cert. den., 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964), the otherwise inadmissible hearsay declarations of co-conspirators may be re-

ceived into evidence when the following foundation is developed.

> First: that the declaration is in furtherance of the conspiracy; second: that it was made during the pendency of the conspiracy; third: that there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant with it. [Citing authorities.]

If the independent evidence adduced in support of the existence of the conspiracy makes a prima facie case therefor, the *Carbo* foundation requirement can be satisfied. *See* United States v. Spanos, 462 F.2d 1012, 1014 (9th Cir. 1972).

■ As to the co-conspirators' declarations admitted into evidence and complained of by De La Torre, it is clear that the Government met its burden of laying the foundation required by *Carbo*. Although De La Torre was linked to the conspiracy by circumstantial evidence, this was sufficient to invoke the co-conspirator's exception as to him. De La Torre's reliance on *Bruton* as well as on certain California cases is misplaced, and none of these authorities compels a contrary conclusion on this issue. Thus *Bruton*, for example, dealt with a postarrest confession by a defendant which was not admissible under any hearsay exception against his codefendant, not, as here, with statements made during the course of a conspiracy and admissible under the co-conspirator exception once a proper foundation is laid. *See* United States v. Projansky, *supra* at 137–138 of 465 F.2d. *Cf.* United States v. Adams, 446 F.2d 681, 683 (9th Cir. 1971), cert. den., 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971) ("concert of action" hearsay exception upheld against 6th Amendment challenge under *Bruton*).

De La Torre also complains about certain testimony received by the district court and then struck pursuant to defense motion. Our review of the case convinces us that by striking such testi-mony and giving a proper cautionary instruction to the jury, the district court judge did not commit error.

### 2. *Severance*

De La Torre contends that the district court should have granted him motion to sever on two grounds: first, because certain co-defendants made judicial admissions through their counsel in order to invoke the defense of entrapment, thus prejudicing De La Torre, and second, because, as with Ellsworth, Aragon volunteered to testify for De La Torre, but only at a separate trial of the latter.

■ Joinder of defendants here was proper under Rule 8(b). That two of the five defendants originally on trial chose to invoke the entrapment defense did not render such joinder improper or entitle De La Torre, without more, to a separate trial.

■ The admissions made by the defendants pleading entrapment did not name or hint at the involvement of any other defendant. Any conceivable taint was removed when the district court carefully instructed the jury that these admissions could not be considered against any other defendant.

De La Torre makes an argument by analogy to pleas of guilty by co-defendants in an effort, again, to bring himself under the canopy of *Bruton*, but that case does not provide a defense here. *See* United States v. Cassino, 467 F.2d 610, 623 (2d Cir. 1972), cert. den. sub nom. 410 U.S. 913, 93 S.Ct. 957, 959, 35 L.Ed.2d 276 (1973). Even were the co-defendants' admissions to be considered as guilty pleas it would not aid De La Torre, for, as this Court held in United States v. Washabaugh, 442 F.2d 1127, 1129 (9th Cir. 1971):

> Informing the jury that such pleas [of guilty] have been entered is not ordinarily erroneous where, as here, the statement is unadorned and accurate, and the jury is carefully instructed not to consider the plea in de-

termining the guilt or innocence of the remaining defendants. [Citing case.]

■ Nor was severance required simply by reason of Aragon's offering to testify at a second trial for De La Torre, for the record does not reveal what the content of such testimony would have been (assuming it would have been forthcoming) or that it would have been exculpatory. Under the standard articulated in United States v. Berlin, *supra,* the district court judge did not abuse his discretion by denying severance.

3. *Sufficiency of the Evidence*

■ Although the evidence against De La Torre was circumstantial, it is settled that such evidence is sufficient to establish a conspiracy, United States v. Jacobo-Gil, 474 F.2d 1213, 1215 (9th Cir. 1973); United States v. Brooks, *supra* at 818 of 473 F.2d (9th Cir. 1973), and in fact conspiracy convictions often rest on just such proof. *See* United States v. King, 472 F.2d 1, 8 (9th Cir. 1973); United States v. Nadaline, 471 F.2d 340, 344 (5th Cir. 1973). De La Torre argues that the district court erred in not giving an instruction on circumstantial evidence under which the jury would have been permitted to convict only if the evidence excluded every reasonable hypothesis except guilt. De La Torre's reliance on California decisions for this proposition, as well as his misbelief as to the state of the law in this Circuit, display an inappropriate disingenuousness. Quite the contrary of De La Torre's implication, this Circuit has addressed itself to the problem on numerous occasions during the past four years and on each occasion has rejected the formulation argued for here. *See, e.g.,* United States v. Trice, 476 F.2d 89 (9th Cir. 1973).

The remaining issues raised by De La Torre are likewise without merit.

Accordingly, the convictions of Ellsworth and De La Torre are hereby affirmed.