**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Bruce Warren HOBSON,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Morton NEWMAN,**
**Defendant-Appellant.**

**Nos. 74–2700, 74–2866.**

United States Court of Appeals, Ninth Circuit.

June 26, 1975.

Rehearing and Rehearing En Banc Denied Sept. 10, 1975.

Certiorari Denied Nov. 3, 1975.
See 96 S.Ct. 283.

Gordon D. Lapides (argued), San Francisco, Cal., for defendants-appellants.

David P. Bancroft, Asst. U. S. Atty. (argued), James L. Browning, Jr., U. S. Atty., John D. O'Connor, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

## OPINION

Before CHAMBERS and CARTER, Circuit Judges, and SCHWARTZ,* District Judge.

JAMES M. CARTER, Circuit Judge.

Defendants Bruce Hobson and Morton Newman appeal from the judgments of conviction, following a jury trial, of harboring a prison escapee and fugitive from justice, being accessories after the fact, and conspiracy, in violation of 18 U.S.C. §§ 1072, 3, and 371 respectively. They allege numerous errors in their joint, six-week trial—errors pertaining to each individually and errors common to both. We affirm.

## FACTS

The facts of this case concern the six-week period subsequent to the highly publicized October 6, 1972, "liberation" of Ronald W. Beaty from the California Institute for Men at Chino. Beaty had been serving federal time at the State facility pursuant to an Arizona federal district court twenty-year sentence for interstate transportation of kidnapped

---

* Honorable Edward J. Schwartz, Chief Judge, United States District Court, Southern District of California, sitting by designation.

persons. While serving this sentence, Beaty joined a revoluntionary group called Venceremos and an escape plan was devised by Beaty and defendant Hobson's mother (Jean Hobson), a member of the Venceremos Central Committee. Pursuant to this plan, Beaty was freed at gun point from a California State vehicle while enroute to San Bernardino County Superior Court for pretrial proceedings concerning his escape from Chino on another occasion.

After the escape, during which a guard was killed, Beaty fled to Northern California, to Arizona, and back to Northern California again before being apprehended while crossing the Oakland-San Francisco Bay Bridge. This case involves the efforts of Bruce Hobson and Morton Newman to aid and harbor Beaty during the month following his escape, all other defendants having been severed from the case before trial.

At trial, Beaty testified that immediately following his escape Hobson's mother drove him to a house in Northern California (Los Altos). Shortly before daybreak the next morning, Hobson himself arrived at the house, helped load weapons into a car, and drove Beaty to a remote mountain cabin owned by Hobson's friends. There, Hobson and his mother guarded Beaty for about a month, furnishing him with a Colt .45 semi-automatic handgun, ammunition, civilian clothes, and false identification papers. During that period, Hobson and Beaty discussed where Beaty could be hidden in the future, problems concerning several other co-conspirators, whether or not to publicize Beaty's membership in Venceremos, the role of Venceremos in the escape and flight efforts, and future plans for acts of violence.

At the end of the month, Hobson and his mother returned Beaty to a Palo Alto residence where, in answer to a phone call, defendant Newman arrived carrying a Colt .45 in a shoulder holster which he later gave to Beaty. Beaty and Newman (also a member of Venceremos) discussed plans for a "shoot out" with police in the event that the residence was taken. An arsenal of weapons was deployed at the various entrances and windows of the residence for this purpose. According to Beaty, Newman took a major part in these proceedings and stood guard over him (along with other co-conspirators) during the next four nights.

During this time, Newman and Beaty discussed the publicity generated by Beaty's escape, the roles played by two other co-conspirators, Beaty's prison experiences, their proposed future association as part of a direct action faction of Venceremos, recommendations by Newman of books on explosives, and the fact that the Colt .45 given to Beaty by Hobson had belonged to Newman and was a "good piece."

Hobson testified at trial that he had understood Beaty to be a Vietnam veteran who had a narcotics problem and wanted to get away for a while, and that he (Hobson) took a gun to the cabin just to have it there. Newman chose not to testify.

## DISCUSSION

On appeal, Hobson and Newman jointly contend that: 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 3 (accessory after the fact) require the defendants' scienter as to the distinctly federal nature of the offense committed by the person comforted and assisted; Beaty did not escape from "the custody of the Attorney General" as required by 18 U.S.C. § 1072 since Chino is a State correctional facility; and certain Venceremos Central Committee notes were improperly admitted into evidence against Hobson and even if properly admitted as to Hobson, necessitated Newman's severance from the case or the giving of his proposed jury instruction.

In addition to their joint contentions, the defendants allege a number of prejudicial errors applicable only to one or the other. Hobson contends that: the admission into evidence of an entry from a suppressed diary for purposes of impeachment constituted prejudicial error; and the court's supplemental jury

instruction amended the grand jury indictment in violation of the Fifth Amendment. Newman contends that: the district court failed to adopt measures to protect him from the risk of transference of guilt, particularly in failing to instruct the jury as to the possibility that multiple conspiracies had been committed instead of the single large conspiracy charged in the indictment; and evidence seized from his house pursuant to an arrest warrant should have been suppressed. We treat these various contentions *seriatim.*

## I.

### JOINT CONTENTIONS

### (a)

*Scienter as to the Federal Nature of the Offense Not Required Under 18 U.S.C. §§ 371 and 3*

Both Hobson and Newman were convicted of being accessories after the fact, in violation of 18 U.S.C. § 3 which provides in part:

> "Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact. . . ."

They contend that in order for them to have violated the statute they must be shown to have known that Beaty's escape (and shooting of the guard) constituted an offense *against the United States.* The district court rejected Hobson's proposed instruction to this effect and refused to grant a judgment of acquittal. The district court was correct in both rulings.

Beaty was clearly guilty of escape. He has been convicted and sentenced to life imprisonment for that escape. There is no requirement that he had to have known that he was committing a federal offense in escaping. *See United States v. Fernandez,* 497 F.2d 730, 736–739 (9 Cir. 1974). It borders on the ridiculous to suggest that Hobson and New-man could be acquitted, despite knowledge that they were aiding Beaty in hiding from the authorities, because they thought he had *only* committed murder and escape from a *State* prison. In fact, the Supreme Court has recently rejected just such a contention with respect to a conspiracy prosecution. *See United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). The Court stated:

> "The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency [here, the prison] affected. . . . The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum." *Id.* 95 S.Ct. at 1264.

In *United States v. Howey,* 427 F.2d 1017 (9 Cir. 1970), this court held that the language of 18 U.S.C. § 641, "Whoever . . . without authority, sells, conveys or disposes of any . . . thing of value of the United States", does not require knowledge that the property taken belongs to the United States. "The reason for including the requirement that the property, in fact, belongs to the Government was to state the foundation for federal jurisdiction. A defendant's knowledge of the jurisdictional fact is irrelevant . . . ." 427 F.2d at 1018.

Hobson contends, however, that *Howey* is inapposite because it involved a principal rather than an accessory. This is essentially his same argument with respect to the conspiracy conviction under 18 U.S.C. § 371. But it is an argument rejected by the Supreme Court in *Feola, supra:* "The general conspiracy statute, 18 U.S.C. § 371, offers no textual support for the proposition that to be guilty of conspiracy a defendant in effect must have known that his conduct violated federal law." 95 S.Ct. at 1265.

In the present case, the defendants intended to aid Beaty escape from the authorities. The fact that they may

not have known the jurisdictional (federal) nature of his pursuers and his crime is irrelevant. To paraphrase the Court in *Feola,* "[i]n a case of this kind the [defendants take their escapee] as [they find] him." *Id.* 95 S.Ct. at 1265.

(b)

*An Escape from a Correctional Facility Designated by the Attorney General is an Escape from "the Custody of the Attorney General" Within the Meaning of 18 U.S.C. § 1072*

The defendants next contend that no federal offense was in fact committed because Beaty escaped from Chino, a State prison, and not from "the custody of the Attorney General." *See* 18 U.S.C. § 1072. They cite no cases directly supporting this contention, but rely primarily upon the fact that the language "or from any institution or facility in which he is confined by direction of the Attorney General" which appears in the escape statute itself, 18 U.S.C. § 751 [1] has been omitted from the harboring statute, 18 U.S.C. § 1072. [2]

However, the defendants have indicated nothing in the legislative history or cases interpreting § 1072 which would suggest Congressional intent not to reach a situation such as that in the instant case where the escapee had been convicted of a federal offense, was specifically committed to "the custody of the Attorney General" by the order of Judgment and Commitment, and where

the relevant federal statute provides that:

"A person convicted of an offense against the United States shall be committed . . . to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served." 18 U.S.C. § 4082(a). *See also* 18 U.S.C. § 4082(b) ("The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, *whether maintained by the Federal Government or otherwise*") (emphasis added). [3]

■ In *Tucker v. United States,* 251 F.2d 794 (9 Cir. 1958), it was held that escape from a Los Angeles County General Hospital "Jail Unit" was an escape from the custody of the Attorney General, where United States Marshals had delivered the defendant to the Los Angeles County Sheriff's Department in order to give testimony in a pending matter. The defendant had been serving a federal sentence at Alcatraz. And, in *Frazier v. United States,* 119 U.S.App.D.C. 246, 339 F.2d 745 (1964), the court held that escape from St. Elizabeth's Hospital also constituted escape from the custody of the Attorney General. The court stated that "it is clear that the 'custody' intended is not limited to actual physical custody, but denotes a type of legal custody which remains in the Attorney General even though the prisoner is assigned to an institution over which the Depart-

---

1. 18 U.S.C. § 751 provides in part:

"Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General . . . shall . . . be fined not more than $5,000 or imprisoned not more than five years, or both . . .."

2. 18 U.S.C. § 1072 provides:

"Whoever willfully harbors or conceals any prisoner after his escape from the custody of the Attorney General or from a Federal penal or correctional institution, shall be imprisoned not more than three years."

3. We also note that the defendants' interpretation of § 1072 would reduce the language "or from a Federal penal or correctional institution" to mere surplusage. The rule of statutory construction that Congress will not be presumed to have done a useless, ineffective, or absurd thing, *see, e.g., Pennsylvania v. Nelson,* 350 U.S. 497, 509–510, 76 S.Ct. 477, 100 L.Ed. 640 (1956), supports the conclusion that "the custody of the Attorney General" was intended to include correctional institutions in addition to *Federal* institutions.

ment of Justice has no control." *Id.* at 746. So also in the present case, we hold that escape from an institution designated by the Attorney General, pursuant to a commitment to his custody, under a federal sentence, is an escape from "the custody of the Attorney General" in the legal sense, even though the institution is run by the State.

### (c)

*The District Court Did Not Abuse Its Discretion Either in Admitting the Venceremos Central Committee Notes or in Failing to Permit Severance*

Over the defendants' objections, the district court admitted into evidence against Hobson a one-page note of the Central Committee of the Venceremos. The note approved Beaty's escape and advocated making the escape and Beaty's affiliation with Venceremos public to "bridge the gap between talk about revolutionary action . . . and actual revolutionary action. It succeeded and shows that actions can be taken."[4] Hobson contends that the prejudicial effect of the note far outweighed its evidentiary value (it was drafted by unidentified individuals after a meeting held outside of Hobson's presence), that the evidence failed to conform to the offer of proof, and that since the notes "only" advocated publicity, their use against Hobson violated his First Amendment rights.

■ We conclude that the trial court did not abuse its discretion in holding that any unfair prejudice was outweighed by the probative value of the note. *See* Rule 403, Federal Rules of Evidence (effective July 1, 1975). A major part of the Government's theory of the conspiracy was that all defendants,

along with Beaty, were members of the Venceremos, that the Central Committee dictated the actions of the members who followed order in military fashion, and that the note indicated a Central Committee decision both to publicize and facilitate Beaty's escape. The note was allegedly typed by Hobson's mother, and was read and ratified by both him and Beaty in each other's presence. Thus, the note was a reasonable link in the theory that Hobson was part of the Venceremos conspiracy, knew of the illegality of Beaty's escape, and recognized that the authorities would be trying to recapture Beaty and that he was to help harbor and conceal Beaty on specific Venceremos Central Committee orders.

■ Since much of the clearly admissible testimony linked Hobson (and Newman) to the Venceremos, the prejudicial impact of the note was slight. And since Hobson ratified the content of the note, he cannot complain that it was not written by him.

■ Our reading of the record indicates that the note did not fail to conform to the offer of proof, but any such failure was totally insignificant and harmless.

■ Hobson's First Amendment argument based upon *United States v. Spock*, 416 F.2d 165 (1 Cir. 1969), is misplaced. In that case, the entire conspiracy and prosecution (conspiracy to counsel, aid, and abet registrants to evade the draft) involved a mixture of protected and unprotected activity. Statements made by some third parties alleged to be co-conspirators were introduced against the defendants to show specific intent. Because of the mixture of protected and unprotected sentiments, the court stated: "The specific intent of one defendant in a case such as this is not ascertained by

---

4. The note reads in part:

"*CC meeting, second week of October.*
1. Ronald Beaty
The general line of the organization on his escape is that the action was right on. The question arose, should we make a big public thing about his being in Venceremos.

"The arguments *for* far outweigh the arguments against. This was a real example of the politics we stand for, and it bridges the gap between talk about revolutionary action, especially regarding prison work, and actual revolutionary action. It succeeded and shows that actions can be taken."

reference to the conduct or statements of another even though he has knowledge." 416 F.2d at 173. The defendant's specific intent to adhere to the illegal portions, however, may be shown "by the individual defendant's prior or subsequent unambiguous statements; by [his] subsequent commission of the very illegal act contemplated by the agreement; or by [his] subsequent legal act if that act is 'clearly undertaken for the specific purpose of rendering effective the later illegal activity which is advocated.'" *Id.*

In the present case, Hobson not only had knowledge of, but also specifically ratified the content of the note. He said on other occasions that he was aiding Beaty avoid recapture under specific Central Committee orders, and committed that on-going, specific illegal act for at least four days. Finally, the note goes beyond mere advocacy of publicizing the escape; it advocates the success of revolutionary *action* (Beaty's escape), and indicates that the continued success (necessarily including avoidance of recapture) will encourage other revolutionary action. On all of the above grounds, *Spock* is just not on point.

Even assuming the admissibility of the note as to Hobson, however, Newman contends that since it was not admissible as to him, he should have been severed from the trial or the court should at least have instructed the jury *at the end of the trial* that the evidence was only admissible as to Hobson.

The issue of whether the court abused its discretion in failing to sever turns on the propriety of the court's assessment of the jury's ability to compartmentalize the evidence against the defendants. *See United States v. De La-Rosa,* 450 F.2d 1057, 1065 (3 Cir. 1971). Here, there were only two defendants on trial. There was no mention of Newman in the note, and in any event the court on two occasions, properly instructed the jury as to its limited admissibility. The relevation in the note of Venceremos aims and thinking could not have prejudiced Newman to any great degree since

he admitted (through Beaty) of being an active member, and his arsenal of weapons sufficiently demonstrated his willingness to engage in violence. In *United States v. Ellsworth,* 481 F.2d 864, 871 (9 Cir. 1973), the court rejected a similar contention with respect to certain admissions of co-defendants, not admissible as to the complaining defendant:

"The admissions made by the defendants pleading entrapment did not name or hint at the involvement of any other defendant. Any conceivable taint was removed when the district court carefully instructed the jury that these admissions could not be considered against any other defendant."

*See also United States v. Berlin,* 472 F.2d 13, 16 (9 Cir. 1973).

The district court twice instructed the jury that the Central Committee note was admissible only as to Hobson and, at the end of the trial, that the jury should not only consider the evidence admitted with respect to each individual defendant in determining guilt or innocence. Newman's contention that it was prejudicial error not to again instruct that the note was not to be considered with respect to Newman is without merit.

## II.

## HOBSON

### (a)

*The Entry From a Suppressed Diary Was Properly Admitted for Purposes of Impeachment*

As part of the Government's case-in-chief, Beaty testified that Hobson had told him that he (Hobson) had gone to his friends' (the Taulbees') mountain cabin a few days before Beaty's arrival to inspect it. This was elicited with respect to the charge that Hobson had conspired "with others" to harbor, conceal and assist Beaty. To refute this inference, Hobson took the stand and the following exchange took place between Hobson and his counsel:

"Q. Let me ask you this. Did you ever make any prior contact or arrangements with Milton or Laura Taulbee before going to the cabin?

A. No.

Q. You did go up there and say, 'Here we come and you be here when we arrive?

A. No."

After receiving a negative response to his question of whether Hobson had made any prior arrangements or preparation at the cabin, the prosecutor on cross-examination introduced an entry in Hobson's diary from the day before Beaty's arrival, in order to impeach Hobson. Among other notations appeared the word "PREPARE". The Government had previously stipulated that the diary would be treated as if a motion to suppress had been granted with respect to it. However, the Government contended, and the district court agreed, that it was still admissible (for purposes of impeachment) on cross-examination under *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) and *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

Hobson contends that his answers on direct were solely defensive, merely denying the elements of the crime charged (conspiring to prepare the cabin to hide Beaty), and that in any event the diary entry was not directly contradictory evidence as required for impeachment purposes by *Walder* and *United States v. Trejo,* 501 F.2d 138 (9 Cir. 1974).

*Trejo, supra,* is distinguishable in that there the defendant only generally denied the crime charged. The court stated that "since the offered evidence does not focus on the truthfulness of a defendant's direct testimony, we hold its introduction into evidence to be error." 501 F.2d at 145. In the proceedings below, on the other hand, Hobson went beyond a mere general denial, also stat-

ing that he had made no prior preparations for Beaty's arrival.

■ In any event, Hobson gave an uncontradicted account of what the word "PREPARE" meant, and it was a very minor piece of evidence in a six-week trial. The court specifically instructed the jury to consider it solely for impeachment. The error, if any, was harmless. *See Trejo, supra,* at 145.

(b)

*The Supplemental Jury Instruction Did Not Impermissibly Amend the Grand Jury Indictment*

Count III of the indictment provided that Hobson "did transport . . . and . . . provide Ronald Wayne Beaty with quantities of food, men's clothing *and* a Colt .45 caliber semi-automatic handgun." (Emphasis added.) The jury evidently had a problem with respect to the gun, since the evidence at trial was that either Hobson gave Beaty a different gun, or that someone else had given Beaty the gun, although it *originally* came from Newman and Hobson. After several inquiries on this matter by individual jurors, the court instructed that if all other allegations had been proved (including transporting Beaty), then proof beyond a reasonable doubt that Hobson furnished Beaty "with quantities of food *or* men's clothing *or* a Colt .45 caliber semi-automatic handgun" would be sufficient. (Emphasis added.)

Hobson argues that the grand jury might have been willing to indict *only* if Hobson had furnished *all* of the above articles. Hence, the court's instruction, changing the conjunctive in the indictment to the disjunctive in the instruction, requires reversal. We disagree.

Hobson's argument is premised upon the holding of the Supreme Court in *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), that an amendment to the body of an indictment violates a de-

fendant's Fifth Amendment rights [5] because there is no way of knowing whether the grand jury would have returned the indictment as amended if they had been given the opportunity. But in *Salinger v. United States,* 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926), the Court limited *Bain* to its facts, holding that it was proper for the trial court to withdraw from the jury all but one of a number of fraudulent schemes alleged in the indictment. Any suggestion that *Bain* might have continuing validity beyond its facts (actual and physical striking out of words on the face of the indictment), was recently laid to rest by the decision of this court in *United States v. Dawson,* 516 F.2d 796 (9 Cir. 1975).[6]

The present case involves a slightly different problem than that in *Salinger* and *Dawson,* however. In those cases, the question was one of surplusage: the court removed all but one fraudulent scheme from jury consideration in *Salinger* and one of two bribery counts arising out of single bank robbery prosecution in *Dawson.* Therefore, conviction even on the amended indictment insured that the jury all agreed as to the remaining count. Hobson contends that in the case at bar each juror *could have* voted to convict with respect to a different act of furnishing, thereby precluding jury unanimity as to any one act.

■■■ Although this argument has surface appeal, its major premise is fatally undermined by *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970), where the Court stated: "The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." The grand jury indictment in this case tracked the language of 18 U.S.C. § 1072 by charging Hobson with harboring and concealing Beaty by transporting him and by furnishing him food, clothing, and a gun. Either the transporting or any of the acts of furnishing would be sufficient to support conviction. Hobson admits that "there was little question as to the transportation, food and clothing." Brief, at p. 39. The effect of the supplemental instruction, then was to permit the jury to convict without finding that Hobson also furnished a Colt .45 caliber handgun. Under *Turner, supra,* and the decisions in this Circuit, this was not improper. *See, e. g., McGriff v. United States,* 408 F.2d 333, 334 (9 Cir. 1969) (elements of the offense denounced disjunctively in the statute, alleged conjunctively in the indictment; instruction to the jury in the disjunctive held proper).

### III.

### NEWMAN

(a)

*The Court Adequately Protected Newman From the Risk of Guilt Transference*

Newman alleges that the trial court did not take precautions adequate to protect him from the risk of "guilt by association," particularly in refusing to instruct the jury as to the possibility that the Government had shown several conspiracies, rather than the one overall conspiracy charged in the indictment. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

■■■ The doctrine enunciated in *Kotteakos* and *Berger,* however, has been applied primarily in those cases where the evidence reveals the likelihood

---

5. The Fifth Amendment guarantees that in federal criminal cases "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . .."

6. For a detailed and thorough analysis concerning the state of the law in this area, see *Dawson,* 516 F.2d 796, at pp. 799–804.

that one or more of the defendants did not know or had not agreed to the overall goals of the other co-conspirators, *e.g.,* where there was a conspiracy to import drugs and one defendant may not have known the drugs were imported when he later bought them. In the proceedings below, on the other hand, the evidence clearly indicated that Newman knew that Beaty was an escapee, that members of the Venceremos were responsible for the escape and subsequent concealment, that he was aiding in that concealment on orders from the Venceremos, and that Beaty planned to move from Los Altos with the help of other Venceremos members for the purpose of showing that revolutionary action was possible. The fact that he may not have known *all* of the purposes involved and *all* of the co-conspirators is irrelevant. Once a conspiracy is shown, only slight evidence is required to link any one defendant to the conspiracy. *See United States v. Knight,* 416 F.2d 1181 (9 Cir. 1969).

Under these circumstances, we conclude that the court's instructions at the end of the trial, along with the instruction limiting the admissibility of the Central Committee note at the time it was introduced, were sufficient to protect against any risk of transference of guilt. In *United States v. Ellsworth,* 481 F.2d 864, 869 (9 Cir. 1973) the court stated:

> "Ellsworth claims that the district court erred in not granting his motion for new trial on the ground of a fatal variance between the one general conspiracy charged in the indictment and the proof at trial of several distinct conspiracies. The defense stems from the decision in *Kotteakos v. United States* . . . ..
>
> "The test here is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy; if so, there is a single conspiracy. . . . Although the proof of Ellsworth's guilt was not strong, it was more than ade-

quate to sustain a conviction, and such conviction carried with it the implied finding that, contrary to this testimony, Ellsworth knew or had reason to know of the existence of the charged conspiracy and its object. That Ellsworth may not have known the precise identities of the other principals is not relevant. . . .

> "To the extent that Ellsworth complains about 'guilt by association,' the district court obviated such problem through the giving of certain adequate cautionary instructions to the jury."

The evidence of multiple conspiracies, lack of evidence of the defendant's knowledge of the conspiracy, and opportunity for "guilt by association" in *Ellsworth* were all stronger than in the present case with respect to Newman. *See also Blumenthal v. United States,* 332 U.S. 539, 551–552 n.8 & 9, 559–560, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Lane,* 514 F.2d 22 (9 Cir. 1975).

(b)

*The Court Properly Admitted Evidence Obtained From Newman's Home Pursuant to an Arrest Warrant*

Pursuant to an arrest warrant, Newman was arrested in his home and a search thereof was undertaken. Photographs of various weapons seized during this search were admitted against him at trial. He contends that the arrest warrant was issued without probable cause, that the arresting officer's entry into the house was made without sufficient notice, that the ensuing search went beyond the limits imposed by *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and that even if legally seized, the photographs should have been stricken as evidence in the case after the court dismissed the counts to which the guns in the photographs related. We hold that the search and seizure were proper in all respects.

The existence of probable cause for the arrest was founded upon Beaty's firsthand, eye-witness account of his escape and Newman's help in concealing

him and furnishing him with weapons and supplies, the fact that his (Beaty's) declarations were against his penal interest, and the subsequent corroboration by the FBI affiant of the fact of the commission of the crime and details regarding the participants. This was clearly sufficient to justify the issuance of the warrant for Newman's arrest. The narcotics cases cited by Newman involving unrevealed paid informers are not apposite. *See Musgrove v. Eyman,* 435 F.2d 1235, 1238 (9 Cir. 1971).

■ With respect to the entry, the officers banged loudly at Newman's door and yelled, "FBI—Open the door." They waited 10 to 30 seconds without response and then broke in the bedroom window to gain admittance. They had seen Newman and at least one other individual in the house as they approached. This observation was coupled with their knowledge that Beaty and others had shot and killed an unarmed guard during his escape, and that Newman had allegedly supplied Beaty with weapons and possessed a small arsenal himself. Furthermore, Newman had allegedly been part of a plan to use machine guns and hand grenades on the authorities if they had tried to arrest Beaty while in the Los Altos house—and Newman had himself inspected all of the various weapons.

With all of this in mind, the officers would have been foolhardy to wait any longer than they did. On virtually identical facts (but without prior knowledge that an arsenal of weapons and an expert with respect thereto was inside) the entry in *United States v. Allende,* 486 F.2d 1351, 1353 (9 Cir. 1973), was upheld. This is therefore an even stronger case for upholding the entry.

Once inside the house, the officers found a number of weapons in "plain view" in various rooms of the house. Newman contends that searches of a house in which an arrest has been made are limited by *Chimel, supra,* to the area

within which the arrested person might have obtained either a weapon or something that could have been used against the officer.

■ *Chimel* was intended to prevent officers from using an arrest as a pretext for ransacking a defendant's house in the search for evidence. Clearly, where the house is reputed to contain an arsenal of weapons and people who know how to use them and have expressed an intent to do so, some protective measures are in order. In the present case, the officers found two persons in the house in addition to Newman. Weapons were lying around in almost every room in plain view. It was entirely proper to quickly search each room for additional persons and weapons. *See United States v. Mulligan,* 488 F.2d 732, 734–735 (9 Cir. 1973); *United States v. Sellers,* 17 Cr.L. Rptr. 2085 (4 Cir. April 10, 1975); *United States v. Briddle,* 436 F.2d 4, 6 (8 Cir. 1970), *cert. denied,* 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824 (1971).

■ Finally, Newman contends that the admissibility of the photograph of the two guns seized at his house was dependent upon counts dismissed by the trial court; since no longer relevant, the evidence should have been stricken. The court did not abuse its discretion in holding that the evidence was relevant as to the remaining counts. The test of relevancy, derived from the common law but stated accurately in Rule 401, Federal Rules of Evidence (effective July 1, 1975), is "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." This test was met with respect to the remaining counts in the present case.

Having decided all of the defendants' contentions on appeal against them, the judgments of conviction are

Affirmed.