**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Thomas Albert TREJO, Defendant-**
**Appellant.**

**No. 73–2262.**

United States Court of Appeals,
Ninth Circuit.

June 10, 1974.

Martha Goldin (argued), of Goldin & Saltzman, Los Angeles, Cal., for defendant-appellant.

Norman D. James, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

\* The Honorable William B. Enright, United States District Judge for the Southern District of California, sitting by designation.

Before ELY and KILKENNY, Circuit Judges, and ENRIGHT,\* District Judge.

ENRIGHT, District Judge:

Appellant was indicted and tried in district court for violation of 18 U.S.C. § 2113(a), (d), robbery of a national bank with a dangerous weapon. Trial before a jury resulted in a guilty verdict of the lesser included offense of robbery without the use of a dangerous weapon. Appellant now attacks this conviction and seeks reversal, claiming five instances of prejudicial error in his trial below.

The government's case in chief consisted of seven eye-witnesses, all of whom identified the appellant as the bank robber, and photographic evidence provided by surveillance cameras located in the bank. Four enlarged photographs from these cameras were shown to the jury, along with a number of police photographs of the appellant. A photographic expert then testified for the government that in his "expert opinion," the individual in the surveillance camera photographs *could be* the defendant.

The defendant testified in his own defense that he was at a friend's house in another city at the time of the robbery, and denied any participation in the robbery. During cross-examination, the prosecution attempted to impeach the defendant by questions concerning a hand gun and a briefcase as depicted in certain photographs. After a negative response, the government introduced evidence that a gun and briefcase had been earlier seized from defendant's home in what was conceded to be an illegal search and seizure. The defendant explained that the gun and briefcase were not similar to the items depicted in the photographs, and an innocent reason existed for their presence, i. e., that he had taken the gun from a person at a "fund-raiser" picnic.[1]

1. The defendant's alibi was that at the time of the robbery, he was at a friend's house in San Bernardino preparing for a "fund-rais-

**140**

## I

■ The appellant contends that the court erred when it failed, *sua sponte,* to instruct the jury to consider eye-witness testimony with caution. Defense counsel did not request such an instruction, nor was an objection raised to the instructions as were given. Under these circumstances, absent clear error affecting the substantial rights of the defendant, the instructions cannot now be attacked on appeal, and no such showing has been made here. United States v. Lipsey, 438 F.2d 974, cert. denied 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (9th Cir. 1971); United States v. Alvarez, 469 F.2d 1065 (9th Cir. 1972); Fed. Rules Crim.Proc. 30. Moreover, even if requested, the trial court would have acted properly in refusing to give such an instruction. *See* Cullen v. United States, 408 F.2d 1178 (8th Cir. 1969). Considering the instructions as given in their entirety, as we must, Medved v. United States, 411 F.2d 617 (9th Cir. 1969), there was no error in the instructions as given.

## II

■ Two witnesses observed the bank robber enter the passenger side of a Volkswagen and make his escape. This escape vehicle was later ascertained to be registered to one Rudy Cabral, Jr., who was present during appellant's trial. Upon cross-examination of one of the witnesses who saw the escape, defense counsel attempted to ascertain if the witness could identify Mr. Cabral as the driver of the getaway car. The trial court, considering that this was examination into collateral matters, and after balancing the rights of appellant against those of Mr. Cabral, ruled against permitting such inquiry. It has been the consistent position of this court that the trial judge has broad discretion in the admission of testimony relating to collateral matters. Enciso v. United States, 370 F.2d 749 (9th Cir. 1967).

The ultimate issue at the trial was the identity of the appellant as the bank robber, to which the identity of the driver of the escape vehicle was clearly collateral. The court did not abuse its discretion in disallowing such cross-examination.

## III

In the investigation that followed the robbery, seven eyewitnesses were shown surveillance photographs taken at the bank to determine if the photographs actually depicted the bank robber.

Later, when the inquiry focused on the appellant, his photographs were placed with photographs of other individuals in a series of "photo spreads." These photo spreads were shown to six of the seven witnesses to determine if the appellant could be identified by the witnesses as the bank robber.

Appellant now raises the contention that this pretrial identification by the witnesses was conducted in such an improper manner as to compel the witnesses to identify the appellant at trial, thereby depriving him of due process of law. There were two photo spreads that were shown to the witnesses. One spread consisted of nine photographs, two of which were of the appellant. The second spread consisted of six photographs, one of which was of the appellant. Each witness who was shown one of these photo spreads selected one or more of the photographs of the defendant as the bank robber. Two of the witnesses were in the same room when they made the identification, and were told that they had chosen the "correct" photograph after they chose the defendant's picture. These same two witnesses, along with another witness, were told that a suspect had been taken into custody before being shown the photo spread. Six of the witnesses viewed the photo spreads again a day prior to trial.

■ Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247

---

er" picnic. It was at this "fund-raiser," which allegedly took place a day following

the robbery, that the defendant testified he seized the gun from a "troublemaker."

(1968), established that when the photographic identification procedures followed is attacked on appeal, the verdict must be set aside if that procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. The record of the trial shows that the witnesses were in close proximity to the bank robber with ample time and opportunity to observe him. There is nothing in the record to suggest that the in-court identification was not made freely and based upon these observations. Moreover, a number of the witnesses were able to point out certain distinctive features of the appellant, such as the peculiar shape of his mouth and lips, to indicate that they had paid special attention to him due to his suspicious behavior. The record does not support the allegation that the photographs earlier shown the witnesses had any causal connection with the witnesses' ability to identify the appellant at the trial, United States v. Sartain, 422 F.2d 387

(9th Cir. 1970). Although far from exemplary, there is no showing that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Simmons v. United States, *supra*.

 Moreover, as no objection was made at trial, this contention is not properly before this court unless we can say, in the sound exercise of our discretion, "plain error" exists. Davis v. United States, 425 F.2d 673 (9th Cir. 1970), Fed.Rules Crim.Proc. 52(b). The "plain error" rule should be invoked only in exceptional cases where it appears to be necessary in order to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process. United States v. Sheley, 447 F.2d 455 (9th Cir. 1971). Such is not the case here. Trial counsel, when specifically given the opportunity to pursue such an objection, declined further inquiry.[2]

---

2. No objection was made at trial to the admission of the identification testimony of the seven witnesses. It was not until the sentencing proceeding that appellant raised this objection in a motion for a new trial. During defense counsel's closing argument, the following exchange took place:

Mr. Reichmann: . . . but the point is it hasn't been demonstrated to your satisfaction as to why the use of photographs was accomplished rather than the more fair process of a lineup.

I say to you that this use of photographs is the most outrageous use of photographs that you are ever going to see as jurors, the most unfair, suggestive use of photographs.

What happens? Mr. Lincoln tells you that, "I showed the witnesses pictures that were taken during the robbery to make sure we are talking about the right robbery suspect." Now, if he does that, you can be sure he shows it to them first rather than afterwards, because what is the point of showing the picture of the robbery suspect that is taken during the robbery after? He wants to make sure that the particular witness is talking about the robbery suspect. That is his reason that he gives you for showing this picture or these pictures that are taken during the robbery.

And so the witnesses are first shown pictures taken during the robbery, and then out comes a spread of pictures. This happens, let us say, a month later. You will recall it is on September 26, five or six weeks after the robbery, that these groups of pictures are shown. Most the witnesses—

The Court: Counsel, approach the side bench.

(The following further proceedings were had at the bench, in the presence and out of the hearing of the jury:)

The Court: The inference the Court is receiving from the argument of counsel is that this defendant has not had a fair trial, and that the methods of identification have been unfairly permitted into evidence and that the identification itself has been unfairly admitted into evidence. Is that intended as the implication?

Mr. Reichmann: Absolutely not. There is absolutely no inference.

The Court: Is there any question in your mind at all that there were available procedures to you for testing any of the methods of identification by photo spread or otherwise?

Mr. Reichmann: There is no claim of that at all, your Honor.

## IV

As part of its case, the government called as an expert witness Mr. Frederick E. Webb, an FBI photographic identification expert. He compared four photographs taken by the bank's surveillance camera at the time of the robbery with four police photographs of appellant and one photograph of appellant obtained from the California Driver's License Bureau. All the photographs had been enlarged so that the head size would be the same to facilitate comparison. Mr. Webb pointed out that in all the photographs, the shape of the face, nose, mouth, and hair were similar. He admitted that the surveillance photographs were not clear enough to allow a positive identification, but stated that the features of the appellant were not inconsistent with the general facial characteristics discernible in the surveillance photographs. He concluded that all the photographs could possibly be of the same individual.

Appellant contends that the admission of this testimony was prejudicial error, as it invaded the province of the jury. During the trial, defense counsel objected to the admission of this testimony as ". . . an ultimate fact to be determined by the jury whether or not the man in the picture taken during the robbery is the defendant. . . ." (R.T. 304). The trial court concluded that it was bound by this court's decision in United States v. Cairns, 434 F.2d 643 (9th Cir. 1970), holding ". . . With respect to the ultimate fact argument, we are ourselves bound by United States

v. Cairns, a decision that appears to be directly and positively in point . . . Frankly, I don't think we have any discretion at this stage to overturn the Ninth Circuit." (R.T. 305).

In *Cairns*, this court stated:

Appellant next contends that over his objection on the ground the testimony would invade the province of the jury, Government's witness, a special agent with the Federal Bureau of Investigation and photographic identification specialist, compared two photographs: a photograph taken by the bank's surveillance camera at the time of the robbery and a police photograph of appellant taken ten days prior to trial. To assist in his identification, he enlarged the head area of the surveillance photograph to the same size as the enlarged head area in the police photograph. The witness then pointed out the similarity in the two photographs in the nose and mouth areas, chin line, hair lines, ear contours and inner folds of the ears, among other things. He then testified that based on all the general characteristics the individual in the surveillance photograph is the individual in the police photograph "or another individual having all of these characteristics as to nose, mouth, chin, and the ear characteristics . . . ." We see no error in the admission of this testimony. While the jury is the sole judge of the facts, expert testimony has long been admissible as an aid to the jury.

434 F.2d at 644.

The Court: All right. Then, of course, counsel may answer in an appropriate fashion.

Mr. Reichmann: Nobody is claiming—

The Court: If necessary, we will sum up in the area the evidence that has been brought already and explain to the jury, if necessary, that other available procedures were open to you and that this has been a fair trial, because we will not permit the inference that a defendant in this courtroom has not had a fair trial. We will reopen the matter to take or make any motions you wish.

Mr. Reichmann: Your Honor, there are no motions. I have not made any complaint whatsoever about the conduct of this Court. I have made no complaint whatsoever. I don't understand what the Court is indicating.

The Court: Perhaps you should read your remarks over at the conclusion of your argument.

Proceed.

R.T. 413–416.

The *Cairns* issue was reexamined in United States v. Brown, 501 F. 2d 146 (1974), where this court reasoned, at 149, "To permit an expert to testify as to his opinion of parentage based on the resemblance of a child to a reputed father in a paternity suit would be grossly inappropriate by the above standard. But just as surely, fingerprint identification, the comprehensive examination of aerial photographs, and other similar scientific and technical evaluations, are obviously within the realm of permissible expert testimony. Testimony as to whether a particular individual is portrayed in a photograph rests on some middle ground. Since the *Cairns* decision relied solely upon traditional expertise fields, we feel it incumbent upon ourselves to reexamine the issue faced in *Cairns*." *Cairns* was thereupon ". . . limited to the precision as argued in its briefs . . ." at 149. Unlike *Brown* and the instant case, the expert in *Cairns* testified to specific matters in great detail, focusing upon such unusual facial oddities as earlobe formations, and an unusual facial crease. *Brown* then held that prior to the admission of any expert testimony on photographic evidence relative to the issue of identity, an offer of proof must be made to the court outside the presence of the jury. The court must then determine if, beyond a preponderance of the evidence, it is convinced that the offered testimony will bring to light facts beyond the common knowledge and experience of the jury. In the case now before us, the expert testimony did not in fact touch on any matter, or offer any observations of the evidence that would not have been beyond the normal faculties of observation of a jury. There were no unusual or peculiar idiosyncrasies, or detailed analyses of facial formations which the jury could not undertake on its own as part of its fact-finding function. It was therefore error to admit this testimony, but we decline to hold that it was prejudicial in view of the ample evidence in the record to support the conviction aside from this expert testimony.

## V

Appellant took the stand and testified in his own defense. His direct testimony consisted of a general denial of the crime, and an assertion of an alibi defense. Upon cross-examination, the prosecutor asked appellant if he owned or had ever owned a pistol and a briefcase as depicted in a surveillance photograph. The response was negative, whereupon the government introduced the fact that a pistol and a briefcase had been found in appellant's home two days after the robbery in what was admitted to be an illegal search and seizure. The appellant was allowed to explain that the briefcase found in his home was not similar to the one in the photograph, and that he had taken the pistol from an "intoxicated youngster" at the fundraiser the day after the robbery. Appellant now contends that it was improper to allow impeachment by the use of the illegally obtained gun and briefcase, when the government was foreclosed from introducing such evidence in its case in chief.

In Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), the Supreme Court upheld the trial court where the government was allowed to introduce evidence of an earlier illegal seizure of heroin to impeach the defendant's direct testimony that he had never in his life sold or possessed narcotics. In its decision, the Court contrasted and distinguished its earlier decision in Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), stating, "There the Government, after having failed in its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examination by asking the accused the broad question, 'Did you ever see narcotics before?' After eliciting the expected denial, it sought to introduce evidence of narcotics located in the defendant's home by means of an unlawful search and seizure, in order to discredit the defendant. In holding that the Government could no more work in this evidence on cross-examination than it could

in its case in chief, the Court foreshadowed, perhaps unwittingly, the result we reach today . . . ." (Fn. omitted) (*Id.* at page 66, 74 S.Ct. at page 356). The court discussed and distinguished the case before it from *Agnello*: "Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." (Fn. omitted) (*Id.* at page 65, 74 S.Ct. at page 356).

Relying heavily upon *Walder*, the Supreme Court in 1971 decided Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1. In *Harris*, the Court allowed the government to impeach the direct testimony of the defendant by a statement which had not been obtained in conformity with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In affirming the conviction, the Court declined to be bound by dictum in *Miranda*,[3] and relied instead upon language in *Walder* that " . . . [T]here is hardly any justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." 347 U.S. at 65, 74 S.Ct. at 356.

Both *Walder, Harris,* as well as *Agnello*, were recently analyzed and discussed by the California Supreme Court in People v. Taylor, 8 Cal.3d 174, 104 Cal.Rptr. 350, 501 P.2d 918 (1972), a case with facts strikingly similar to the present case. In *Taylor*, the defendant's testimony on direct examination consisted of a denial of the factual elements of the charged crime of possession of heroin. On cross-examination, the state inquired if the defendant had ever seen narcotics before, and after eliciting the expected negative response, proceeded to introduce evidence of an earlier illegal search where heroin was found in the defendant's personal effects. The California Supreme Court rejected the concept that *Harris* allowed the government to introduce illegally obtained evidence whenever the defendant chose to take the stand to testify. Rather, the California court stressed that *Agnello, Walder*, and *Harris* were compatible and distinguishable from one another in that in both *Walder* and *Harris*, the illegally obtained evidence directly contradicted certain aspects of the defendants' direct testimony.[4] That was held not to be the case in *Taylor* and thus the court ruled

3. The court was apparently referring to the following language, found at 384 U.S. at 476–477, 86 S.Ct. at 1629. *See* Groshart v. United States, 392 F.2d 172, 177 (9 Cir. 1968):

"The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of *any statement* made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. *In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.*"

4. Although perhaps differing in their relative values for impeachment and evidentiary

that illegally obtained evidence may be introduced for impeachment purposes only when that evidence contradicts or impeaches some aspect of the defendant's direct testimony. In reaching that conclusion, the court reasoned:

"Affirming the conviction, [in *Harris*] the United States Supreme Court relied primarily on *Walder*. Both the majority and dissenting opinions emphasized that the extra-judicial statement *"contradicted petitioner's direct testimony"* (*id.* 401 U.S. at pp. 223, 227, 91 S.Ct. 643 [28 L.Ed.2d at pp. 3, 5–6]). Quoting *Walder's* reasoning that the illegality of impeaching evidence is no justification for letting the defendant *"affirmatively resort to perjurious testimony,"* the court concluded (401 U.S. at p. 226, 91 S.Ct. 643 at 646 [28 L.Ed.2d at p. 5]): "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior *inconsistent* utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier *conflicting* statements." (Italics added.)

*Harris* is thus factually distinguishable on the same ground as *Walder*. Here the defendant on direct examination offered no elaborate justification for his conduct, and the prior illegally obtained evidence was therefore not "inconsistent" or "conflicting" with that testimony. Defendant did not rely on the illegality of the impeach-

ing evidence as a sword to commit perjury, but simply as a shield against the consequences of concededly improper police practices.

8 Cal.3d 174 at 184–185, 104 Cal.Rptr. 350 at 357, 501 P.2d 918 at 925 (emphasis added in part.)

■ We find such reasoning persuasive and would decline to accept the concept that *Harris* now permits any illegally obtained evidence to be admitted for impeachment whenever a defendant takes the stand.[5] We agree with the Seventh Circuit, where it stated in Romanelli v. C. I. R., 466 F.2d 872 (1972) at 878, "We do not think . . . that *Harris* implies a rule that the only situation where failure to give *Miranda* warnings will ever result in exclusion is the case in chief in a criminal prosecution. Rather, *Harris* focuses attention on balancing, as a matter of policy, the deterrent effect of exclusion on proscribed police conduct in the particular circumstances." Therefore, since the offered evidence does not focus on the truthfulness of a defendant's direct testimony, we hold its introduction into evidence to be error. This court cannot, however, conclude that the errors discussed were of such a prejudicial nature to compel reversal. The record, when considered in its entirety, discloses that the appellant received a full and fair trial, and that the verdict is amply supported by the evidence. No objection was raised as to admission of the gun or briefcase, and the jury evidently rejected it when it declined to convict appel-

functions, we perceive no distinction between an instance where a statement is obtained in violation of *Miranda* and where tangible evidence is obtained through an illegal search and seizure relative to the underlying policy of serving as a deterrent to illegal police action. This being so, the same general considerations should govern the admissiblity of each type of evidence for impeachment purposes, subject of course, to the inherent qualities of each type of evidence being considered. For instance, a statement defective under *Miranda* would still have to meet adopted standards of trustworthiness.

5. *Harris* has been cited in three cases in this circuit without extensive discussion. In Howard v. Craven, 446 F.2d 586 (9th Cir.

1971), *Harris* was distinguished and held not applicable where a prior conviction obtained without counsel was admitted to discredit the defendant's character.

In United States v. Davis, 447 F.2d 988 (9th Cir. 1971), the text of the entire per curiam opinion was:

The judgments of conviction are affirmed. Harris v. New York (citation), answers the point made under Mallory v. United States, (citation).

Other points we find without merit.

In Brooks v. United States, 449 F.2d 1296 (9th Cir. 1971), the court stated, " . . . assuming arguendo illegal search, under Harris v. New York, the trial judge properly admitted the letter if it met trustworthy standards, which it would."

lant of the crime of armed robbery, choosing instead to convict him of the lesser included offense of robbery without a dangerous weapon. Appellant was permitted to explain the presence of the gun and briefcase in his home, and the jury evidently accepted that explanation.

The judgment is affirmed.

KILKENNY, Circuit Judge (concurring):

I concur in the affirmance of the conviction, but not for the reasons stated by the majority. In particular, I do not agree with the limitations suggested by the majority on the breadth of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). While *Harris* may have some limitations, we should not attempt to define them on the record here presented.