UNITED STATES of America, Plaintiff-Appellee,

v.

William Courtney BATTS, Defendant-Appellant.

No. 76–2308.

United States Court of Appeals, Ninth Circuit.

June 3, 1977.

As Amended Aug. 2, 1977.

---

Murray B. Guterson, Seattle, Wash., argued, for defendant-appellant.

Peter Mair, Asst. U.S. Atty., Seattle, Wash., argued, for plaintiff-appellee.

Before KENNEDY and ANDERSON, Circuit Judges, and VAN PELT,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Batts and one Michael Heiges were charged in a two-count indictment with the importation of hashish in violation of 21 U.S.C. §§ 952, 960(a)(1) and 960(b)(2) and 18 U.S.C. § 2 and for possession of hashish with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2. Mr. Heiges, not wishing to test the fact-finding process, fled the jurisdiction and is still at large. Batts was tried by a jury and was convicted on both counts. Batts appeals and we affirm.

The sole issue presented for review is whether it was error to allow the government to introduce, in its rebuttal case, evidence of prior criminal activity of the appellant.

The facts taken in the light most favorable to the government reveal that Batts and Heiges arrived in Heiges' El Camino truck at the port of entry near Lynden, Washington. A subsequent search at the port of entry disclosed 15 bricks of hashish hidden in the wall of the truckbed. The concealed compartment in the wall of the truckbed was covered by a metal plate secured by phillips head screws. A set of

* Honorable Robert Van Pelt, Senior United States District Judge, District of Nebraska, sitting by designation.

tools which contained numerous phillips head screwdrivers was also found in the truck.

A detailed account of what occurred at trial is necessary to understand how the issue unfolded. Immigration Inspector Bunch, the initial inspection officer on the scene, was the first witness to testify. He testified that after asking the routine preliminary questions, he inspected the interior of the El Camino and found marijuana seeds. He then directed the truck to the secondary search area. He testified that the two occupants were "overly nervous and overly helpful." (R.T. 9) He then testified as to the occurrences surrounding the search and eventual discovery of the hashish. He also testified that he had discovered the set of tools in the bed of the El Camino.

The next person to testify was Customs Inspector Barnes. He testified that since he owned an El Camino and was familiar with its construction, he assisted Officer Bunch in his search of the vehicle. He testified as to his discovery of the hashish in the concealed compartment in the wall of the truckbed. He testified that appellant had told him that the set of tools found was appellant's. He testified that he had personally searched appellant and found a silver trinket around appellant's neck. He testified that appellant told him that it was a coke spoon.[1] At this time, Exhibit 10, the coke spoon, was admitted without objection. He testified further as to comments by appellant regarding the "luckiness" of the search [2] and to appellant's request for photos of the hashish.[3]

The next witness pertinent to our discussion was DEA Agent McClary. He testified that during his interview of appellant, appellant told him he was the driver of the vehicle. He also testified that Mr. Heiges did not have a valid driver's license and that appellant did have a valid driver's license. DEA Agent Brant was next to testify and he testified as to the chain of custody of the coke spoon and how the coke spoon was used. All of this testimony was adduced without objection. Upon the conclusion of his testimony, the government rested.

The first witness to testify for the defense was the appellant. He testified as to his personal history and background, including his family situation, education, and employment record. He identified the box of tools and testified that they were his, and that he did not permit anyone to use his tools unless he was personally present. He testified as to his acquaintanceship with Mr. Heiges and the reasons why he accompanied him on the trip to Canada. He described the sojourn into Canada and denied that he was driving the El Camino when it arrived at the port of entry. He also testified that he asked Inspector Barnes if the discovery of the hashish was just lucky,[4] and that he had requested photos of the

1. "Q. And what did you do or say at that time?
   A. (Mr. Barnes) I said that it looks like a coke spoon. He (appellant) said it was." (R.T. 47)

2. "A. (Mr. Barnes) . . . and he asked me was it just lucky that I found the drugs where I did, and I told him that not necessarily lucky, that we do look especially on certain cars that have compartments similar to that of the El Camino." (R.T. 49)

3. "A. (Mr. Barnes) . . . and he started taking pictures of the drugs, and Mr. Batts asked if that was a newspaper man or a photographer from the newspaper, and I told him it wasn't because that was a Customs officer, and I told the port director that I would like to have some pictures of

the seizure myself, and if any of them came out, Mr. Batts said he would like to have some of the pictures."

4. "Q. Did you also make some inquiry as to whether they had some information that they were going to find some drugs or whether it was just dumb luck or something like that?
   A. Well, I asked him what the deal was because like we were almost ready to go through, and I was just about ready to get back in the car when they found it and started checking back there, and I didn't know what was going on, I didn't even know what they had found until the DEA agent told me." (R.T. 118–119)

seizure.[5] Appellant also denied any knowledge that the hashish was hidden in the car.

During cross-examination, and without objection, the following colloquy took place:

"Q. You are being handed No. 10, the spoon; what is that, Mr. Batts?

A. That's a necklace that was given to me by my girlfriend.

Q. And what is it supposed to be?

A. Well, I used it for cleaning the dirt out from under my fingernails. I don't know what they use it for.

Q. You don't know what it is?

A. Well, I had an idea when they were asking me, 'Well, don't you use this for sniffing coke?' and I said, 'No, I do not.'

Q. Is what you are saying is that you didn't know before they said anything that that is commonly known as a coke spoon?

A. No, I did not.

Q. You had no knowledge about that?

A. No, sir.

Q. No knowledge about cocaine use, are you saying no?

A. No." (R.T. 135)

Appellant then called as a witness his girlfriend, who testified that she had received the coke spoon from a friend and had given it as a gift to the appellant. This friend also testified and corroborated the girlfriend's testimony.

▉ On rebuttal, over appellant's objection, the government introduced evidence showing that appellant had sold a large amount of cocaine to an undercover agent seven months previous to the incident in question. This sale did not result in a conviction as the cocaine was suppressed be-cause of an admittedly illegal search and seizure. The trial court firmly and correctly instructed the jury that such evidence was admissible only to impeach appellant's credibility and to show knowledge and intent.

As we base our affirmance on the proper exercise of the trial court's discretion, we must attempt to view this matter from the perspective of the trial court as the issue unfolded before it. It must first be recognized that testimony about the coke spoon and the coke spoon itself had already been received in evidence without objection before appellant took the stand. On cross-examination, appellant testified that he had no knowledge of cocaine or the uses for the coke spoon. This line of inquiry was not objected to by appellant's counsel. At this point, only the trial court, *sua sponte*, could have ordered the testimony stricken. Such a procedure by the trial court would have been questionable since, as noted, evidence relating to the coke spoon had already been received in evidence and it was at least arguable that appellant had opened up the subject area by testifying to other contemporaneous events at the port of entry.[6]

Had the trial court been faced with an objection, it was still within the court's power to admit the testimony. Rule 611(b), Federal Rules of Evidence, states, in pertinent part: "The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." In light of the factors mentioned above, it would not appear to have been an abuse of discretion to allow this testimony. As there was no objection, the trial court was not faced with this issue.

---

**5.** "Q. And at any time did you make any inquiry of the man who made the pictures or anybody else in his presence?

A. Yes, I asked him if I could have a photograph because no one would believe me if I told them what happened." (R.T. 118)

**6.** In *Banning v. United States*, 130 F.2d 330 (6th Cir. 1942), *cert. denied*, 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556 (1943), the court stated: "It frequently happens that on direct examination of a witness as to a conversation, transaction or other matter, counsel will bring out only such parts as are favorable to the party he represents. When this occurs, it is the right of the cross-examiner to put the trial court in possession of the full details respecting the matters within the scope of the direct examination." 130 F.2d at 338.

*See also* Wright, Federal Practice and Procedure: Criminal § 416, p. 197; 81 Am.Jur.2d, Witnesses § 481, p. 489, 490.

On the basis of this testimony properly received by the trial court, the prosecutor stated:

"MR. MAIR: Again in light of Mr. Batts' flat denial of any knowledge of cocaine, I would introduce—seek to introduce testimony of officers who would testify that Mr. Batts offered and negotiated a cocaine sale with them before this event." (R.T. 149)

The trial court was then squarely faced with the issue of whether to submit the case to the jury in its present false light or to allow the rebuttal evidence to put the jury on notice of all relevant factors necessary to perform its function of ascertaining the truth. More specifically, the trial court was faced with a confrontation of the "no extrinsic evidence rule" contained in Rule 608(b) [7] and the general purpose of the rules of evidence as stated in Rule 102.[8]

We believe that the ultimate purpose of the rules of evidence should not be lost by a rigid, blind application of a single rule of evidence. Individual rules of evidence, in this instance Rule 608(b), should not be read in isolation, when to do so destroys the purpose of ascertaining the truth. This is especially so when a witness directly contradicts the relevant evidence which Rule 608(b) seeks to exclude.

This view is supported by Judge Weinstein, who, in speaking directly to Rule 608(b), stated:

"Rule 608 expresses the Advisory Committee's feeling that since the issue of credibility is often central, depriving the jury of relevant information about witnesses is unwarranted and unduly interferes with the law's basic emphasis on truth-finding. It recognizes, however, that a mechanical test of admission may be incapable of achieving justice in a particular case. Rule 608(b) should ac-

cordingly be interpreted in a manner consonant with the basic aims of the rules of evidence: to strike a balance between the needs of the judicial system and the needs of the individual witness as determined by the unique circumstances of the case in which he is appearing."

3 Weinstein's Evidence, § 608, at 608–24.

Judge Weinstein also sets forth Senator McClellan's position on the need for full cross-examination in conjunction with rule 608(b) as expressed in the Senator's letter of August 12, 1971, as follows:

"Of . . . concern to me is the apparent shift away from the sort of full and effective cross-examination envisioned by the Supreme Court in *Michelson v. United States*, 335 U.S. 469 [69 S.Ct. 213, 93 L.Ed. 168] (1949) by the substitution of the phrase 'clearly probative . . . and not remote in time' in Subdivision (b), in the March 1971 version for the term 'relevant' in the March 1969 draft. Granted that abuse is possible, I would trust to the common sense, fairness and discretion of the trial judge under a general concept of 'relevancy' before introducing unnecessary second guessing on an appeal on issues such as 'clearness' and 'remoteness.' I urge, therefore, a return to the original language of the March 1969 draft; the present draft bespeaks too much of a lack of trust in trial judges."

3 Weinstein's Evidence, § 608 at 608–16, n. 8.

While the original language was not readopted in the final version of the rules, the word "clearly" was omitted which we feel provides greater flexibility and discretion for the trial judge.

The comments of the trial judge appear to indicate, although not specifically stated, that he was undertaking the balancing test

7. Rule 608(b), Fed.Rules Evid., states in pertinent part:

"(b) *Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence."

8. Rule 102, Fed.Rules Evid. states:

"These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

as advocated by Judge Weinstein. The trial court stated:

> "THE COURT: . . . Frankly, I was going to rule with Mr. Guterson on this until the testimony of Mr. Batts. He stated that he didn't know—had no knowledge about cocaine use, no knowledge about the use of this spoon. He also testified, and this response kind of slipped by, he testified that he really didn't know what this was, and I'm speaking of the spoon, speaking of the hash, until later, and he found out what this substance was." (R.T. 151–52)

The admittance of rebuttal evidence is subject to the sound discretion of the trial court. *United States v. Perez,* 491 F.2d 167 (9th Cir.), *cert. denied,* 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974). Great deference must be accorded to this discretion and the judgment of the trial court. He was present and able to observe appellant's manner and demeanor on the stand. Our review of the "cold record" discloses to us that the general tenor of appellant's direct testimony was a portrayal of one completely naive about drugs. The trial judge was in the best position to evaluate the effect this mis-painted picture had on the jury. By admitting the rebuttal evidence, the trial court merely completed the picture as to appellant's true involvement and knowledge in the drug world and thereby corrected a distorted view of appellant's testimony.

We must also note that the trial court was aided in applying the above-mentioned balancing test by the fact that the rebuttal evidence consisted of prior activity in drugs, albeit a different drug. The connecting factor between the crime charged here and the rebuttal evidence is the fact that the crime here charges an intent to distribute (hashish) and the rebuttal evidence discloses an act of distribution. Merely because the drugs involved are different does not strip this conduct of its evidentiary value. The past act of distribution of one drug is relevant to show knowledge, motive and intent on the part of appellant to partake in the attempt here to import commercial quantities of yet another drug for the purposes of distribution. Rule 404(b), Federal Rules of Evidence, further supports the trial court's ruling and the balancing process, we think, is implicit in the Rules, by providing, *inter alia,* that such evidence is admissible to show motive, intent, knowledge, or absence of mistake or accident. *See also United States v. Marshall,* 526 F.2d 1349, 1360–1361 (9th Cir.), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976). The relevant factor is the type of activity undertaken, not the identity of the drugs. *United States v. Perez, supra; United States v. Rivera,* 437 F.2d 879 (7th Cir. 1971). When such probative value is coupled with, as in the present case, a claimed lack of knowledge about drugs, the rule of evidence which could exclude such conduct should be carefully scrutinized and weighed in light of the ultimate purpose of ascertaining the truth. We believe the trial court properly exercised its discretion in not applying in isolation a rule of evidence which would destroy this goal.

We must emphasize that our holding today is based solely on the facts of the present case and the trial judge's discretionary powers in response to those facts. This decision should not be read as creating a new rule of evidence or a new approach to the Rules of Evidence. This decision merely reflects that when a rigid application of a rule of evidence would obstruct and defeat the central purpose of the rules as a whole, a balancing test of the peculiarities and relevant factors of the individual case should be undertaken. Under the facts of this case, the trial court correctly found that the balance was in favor of its ruling admitting the rebuttal evidence.[9]

AFFIRMED.

---

9. We are mindful of the dissent's reference to *United States v. Trejo,* 501 F.2d 138 (9th Cir. 1974). We question the wisdom of the finding of error in that case, but note that, even though the trial court ruling was held to be error, it was not prejudicial error and the conviction was affirmed. It is the result of a rigid application of a single rule of evidence or prior case

KENNEDY, Circuit Judge, dissenting:

The majority opinion all but concedes that its holding contradicts the law of this circuit which mandates that the exclusionary rule apply where illegally seized evidence is proffered to show prior bad acts. The opinion also contravenes express provisions of the Federal Rules of Evidence. The majority justifies its departure from these authorities either by attempted factual distinctions that are wholly unpersuasive or by arguments that have been expressly rejected by the draftsmen of the Federal Rules of Evidence. For these reasons, I respectfully dissent.

The majority must agree that Batts did not open the subject of his previous drug use. He briefly testified about his residence, education, and background, as will any defendant who takes the stand. Of necessity he then related the events at the customs station on the day of his arrest. The prosecution knew that Batts had been arrested on cocaine charges seven months before the incident at bar. On cross-examination the prosecution sought to find an opening by which it might introduce into evidence the defendant's prior bad acts. It took great pains to question Batts about the cocaine spoon he was wearing when he was arrested. The prosecution's obvious purpose in asking the defendant about the cocaine spoon was to invite Batts to deny any knowledge of cocaine, so that the damaging evidence of his earlier cocaine dealings might be brought to the jury's attention. By using this tactic, the prosecution introduced extrinsic evidence in rebuttal. The Government called an undercover agent who testified at length concerning his purchase of cocaine from Batts. It also introduced three clear plastic bags of cocaine that had been seized in violation of the

fourth amendment at the time of Batts' arrest following the cocaine sale.

In *United States v. Trejo,* 501 F.2d 138 (9th Cir. 1974), this court considered the applicability of the exclusionary rule where illegally seized evidence is offered to show prior criminal conduct. In *Trejo,* after examining the relevant decisions of the Supreme Court on the issue, we held that the controlling distinction in deciding whether illegally seized evidence may be admitted for impeachment purposes is whether the subject of prior criminal conduct is opened by the defendant in his direct testimony or instead by the prosecution on cross-examination. We held that illegally seized evidence may not be admitted where the prosecution opens the line of inquiry. As stated in *Trejo*: "[S]ince the offered evidence does not focus on the truthfulness of [the] defendant's direct testimony, we hold its introduction into evidence to be error." 501 F.2d at 145.

The *Trejo* rule controls the instant case. The illegally seized evidence introduced in rebuttal did not focus on the truthfulness of Batts' direct testimony. As in *Trejo,* the defendant's protestations of innocence during his direct examination were limited to a general denial of the crime for which he was charged. The defense carefully avoided raising on direct the issue of Batts' previous experience with drugs. The relevance of the illegally-seized evidence for impeachment purposes is confined to the answers Batts gave to questions put to him by the prosecution on cross-examination. Since Batts did not testify on the subject of his prior conduct during his direct examination (or voluntarily raise it on cross-examination), it was error to allow the illegally seized cocaine into evidence.[1]

law and appears to overlook the importance of the truth-finding process. Moreover, we believe the rationale of our holding under the facts in this case is more appropriate to the circumstances and is more consistent with the aim and central purpose of the Federal Rules of Evidence. We also note that *Trejo* was decided before the effective adoption date of the Federal Rules of Evidence. Cases discussing the knowledge and intent theory prior to adoption

of the Federal Rules of Evidence, such as *Trejo,* are of lessened authority since the adoption of the Federal Rules of Evidence.

1. The factual setting of the issues before us is strikingly similar to that in *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), on which our decision in *United States v. Trejo* is predicated. In *Agnello* the defendant had been tried for drug-related offenses.

The majority's treatment of *United States v. Trejo* is unconvincing. Fed.R. Evid. 404(b), which permits the introduction of evidence of prior bad acts to prove motive or knowledge in a proper case, is merely a statement of the rules controlling the admissibility of prior conduct for specific purposes. It has nothing whatever to do with whether or not illegally seized evidence is subject to the operation of the exclusionary rule. I fail to see how the Federal Rules of Evidence may take precedence over a rule of constitutional dimension. Furthermore, application of the Rules of Evidence would be far too complex if we were to *use* them as *ad hoc* justifications for altering settled principles of constitutional interpretation to which they do not directly pertain. Finally, if the *Trejo* case were wrongly decided, as the majority hints that it was, then the holding of that case can be reversed only by our en banc reconsideration of the principles established therein.

The majority's second proffered rationale for admitting the rebuttal evidence, the claim that it constituted proper impeachment under Fed.R.Evid. 608(b), is contrary to the express terms of that rule. Rule 608(b) explicitly provides: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." The rule codifies conventional practice which has evolved since the early eighteenth century. *See* 3A Wigmore, Evidence § 979 (Chadbourn rev. 1970); E. Morgan, Basic Problems of Evidence 73 (1962); Hale, *Specific Acts and Related Matters as Affecting Credibility,* 1

Hastings L.J. 89 (1950). Rule 608(b) has been applied unequivocally by this and other circuits.[2]

The majority holds that the trial judge properly exercised his discretion in admitting the rebuttal evidence so the case would not go to the jury under a "false light." What the court ignores is that the Federal Rules specifically provide only two exceptions to the "no extrinsic evidence" rule, neither of which permit extrinsic evidence of prior bad acts to impeach in these circumstances. Specific instances of conduct to support or impeach credibility are first provable when they have been the subject of criminal conviction, as provided in rule 609. Second, specific instances may be inquired into *on cross-examination of the witness himself,* in the discretion of the court, "if probative of truthfulness or untruthfulness . . . (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." Fed.R.Evid. 608(b).

The legislative history of rules 608(b) and 609 indicates that Congress considered the balance between the importance of ascertaining the truth and the dangers of undue prejudice and that it designed these provisions carefully to provide these two exceptions to the rule, but no others.[3] The discretion of trial judges to admit evidence of specific instances of conduct to impeach or support credibility was intended to be confined to these exceptions.

The legislative history of rule 608(b) cited in the majority opinion does not support the majority's conclusions. Considerable dis-

---

At the time of his arrest, he was carrying packages containing cocaine on his person. On direct examination Agnello testified he did not know the packages contained cocaine and that he would not have been carrying them had he known of their contents. On cross-examination, the defendant stated he had never seen narcotics. The Supreme Court ruled that the trial court committed reversible error in allowing the prosecution to introduce into evidence a can of cocaine illegally seized from Agnello's house. *Agnello v. United States,* 269 U.S. at 35, 46 S.Ct. at 7.

**2.** *United States v. Wood,* 550 F.2d 435, 441 (9th Cir. 1976); *United States v. Edwards,* 549 F.2d 362, 367–68 (5th Cir. 1977); *United States v. Cluck,* 544 F.2d 195 (5th Cir. 1976); *United States v. Estell,* 539 F.2d 697 (10th Cir. 1976).

**3.** For an extensive and careful discussion of the legislative background of rule 609, *see United States v. Smith,* 551 F.2d 348 (D.C.Cir.1976), and references therein.

cussion in formulating the rules centered around the scope of cross-examination as to specific instances of conduct. It is instructive to note that while there were differences of opinion as to how broad the discretion of the trial court should be in permitting such cross-examination,[4] *all* of the participants in the debate took for granted that a cross-examiner must accept the answers he receives about specific instances relating to credibility and that he could not introduce extrinsic evidence of those matters.[5] This general understanding of rule 608(b) was succinctly expressed by Professor Cleary, the reporter of the Advisory Committee on Federal Rules of Evidence, in a statement to the House of Representatives during its hearing on the rules. Professor Cleary reported:

> If relevant to truthfulness and not remote in time, inquiry may be made upon cross-examination as to incidents bearing upon the credibility of a witness, *but they may not be proved by extrinsic evidence. The cross-examiner is bound by the answer.*

*Federal Rules of Evidence: Hearings on H.R. 5463 Before the Special Subcommittee on Reform of Federal Criminal Laws of the Committee on the Judiciary, House of Representatives,* 93d Cong., 2d Sess. 96 (1973), *reprinted in* 20 U.S.Sup.Ct. Digest 239, 256 (1975) (emphasis added).

In support of its interpretation of rule 608(b) the majority quotes from a letter by Senator McClellan to the Committee on Rules of Practice and Procedure and from Judge Weinstein's treatise on evidence. 3 Weinstein's Evidence ¶¶ 608[02] at 608–16, 608[05] at 608–24 (1975). The majority misperceives the type of discretion being discussed in those explanations. Both Senator McClellan's letter and the passage quoted from the treatise address the factors that the trial court is allowed to and should consider in the exercise of its statutory discretion to allow inquiry about specific instances of conduct *during cross-examination of the witness himself.* This is hardly support for the proposition that the court has discretion to override the limitations of rule 608(b) by an *ad hoc* and vaguely defined exception.

While the notes of the Advisory Committee on the Federal Rules make clear that some of the rules are ones of general import that can be applied with considerable flexibility, *see, e. g.,* Notes to Federal Rules of Evidence 404(b), 611, the Committee's com-

---

4. As originally drafted in 1969, the rule allowed a trial court the discretion to permit cross-examination if the incidents were "relevant to truthfulness or untruthfulness." There were objections that the rule as drafted was too broad and presented serious potential for abuse. *See, e. g.,* Objections of Professor Brook to the Advisory Committee on proposed rule 608, *quoted in* 3 Weinstein's Evidence ¶ 608[02] at 608–13. The words "relevant to" were stricken from the rule and were replaced in the March 1971 draft by the words "clearly probative of." There was controversy over these changes also. The Committee on Trial Practice and Technique of the Second Circuit believed the allowable scope of cross-examination under the rule was too broad. The Department of Justice and Senator McClellan, on the other hand, were of the opinion that the rule was too restrictive. 3 Weinstein, *supra,* ¶ 608[02] at 608–14.

5. Commenting on the March 1971 draft, the Department of Justice, which advocated a broad rule, noted:

> By limiting the scope of cross-examination the proposed Rule would provide too free an opportunity to parade false or biased charac-

ter witnesses. The substantial possibility of abuse under the accepted test of cross-examination, which the comment to the Revised Draft conjectures, is less significant than there assumed. . . . The possibility of abuse is best guarded against by the now common practice of trial judges requiring cross-examiners to give their professional assurance that they have reasonable grounds to believe that such specific instances of misconduct have occurred; by the rule that inquiry concerning specific instances of misconduct made in bad faith may be the basis for reversal of a conviction; *and by the inherent limitation of the common law that "[i]f the witness denies the alleged misconduct, the examiner 'must take his answer,' not in the sense that he may not further cross-examine to extort an admission but in the sense that he may not call other witnesses to prove the discrediting acts."* Report 42–43 (1971), *reprinted in part in* 3 Weinstein's Evidence ¶ 608[02] at 608–15 (emphasis added and citations omitted).

ments indicate that there is no discretion to ignore the specific language of the first sentence of rule 608(b). The comments identify no exception to the general rule except as stated in the rule itself. And Judge Weinstein notes that: "Rule 608(b) is intended to be restrictive—and was amended to ensure that it would be restrictively interpreted by trial courts . . . ." 3 Weinstein, *supra*, ¶ 608[05], at 608–28.[6]

Finally, even assuming that some exception could be made to rule 608(b), the court's appeal to the general principles of rule 102 has no merit. Where the prosecution declined to use the very device provided by the rule to allow some inquiry into prior conduct for impeachment purposes— the right to cross-examine Batts about his prior drug dealings—there is no justification for a court-created exception to rule 608(b). The prosecution chose not to press Batts about his denial of any knowledge about cocaine. Instead it waited until the end of the trial. Then the Government introduced a police detective who narrated the prior cocaine arrest in great detail, and in conclusion it introduced three plastic bags of cocaine. The effect of this on the jury was obviously overwhelming.

Thus, even if the majority's interpretation of the interplay of rules 608(b) and 102 were correct, I still could not agree that we should distort the rule where the prosecution manifestly failed to use it properly. And, if the evidence were properly admissible under rule 404(b), as the majority contends, the necessity for creating this new exception to rule 608(b), vanishes completely.

For these reasons, I would reverse the conviction.

---

**6.** In its attempt to distinguish *Trejo,* the majority intimates that the rule announced in that case is the product of rigid principles that have been replaced by more malleable and flexible federal rules. But the Federal Rules of Evidence are more rigid than the rules evolved at common law on the issues before us. Before the enactment of the Federal Rules, we permitted extrinsic evidence on rebuttal to prove the falsity of a witness' statement on direct. *White*

*v. United States,* 317 F.2d 231 (9th Cir. 1963) and *Ferrari v. United States,* 244 F.2d 132, 140 (9th Cir. 1957), *both citing Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); *Brady v. United States,* 148 F.2d 394, 395 (9th Cir. 1945). In light of the express dictates of rule 608(b), this common law rule of evidence has no continued vitality in the federal courts.