**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Courtney BATTS, Defendant-Appellant.**

No. 76–2308.

United States Court of Appeals, Ninth Circuit.

April 13, 1978.

As Amended April 20, 1978.

---

Murray B. Guterson (argued), of Seattle, Wash., for defendant-appellant.

Peter Mair, Asst. U. S. Atty. (argued), Seattle, Wash., for plaintiff-appellee.

Before KENNEDY and ANDERSON, Circuit Judges, and VAN PELT,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

This appeal has been referred back to the panel by the court sitting en banc as having been taken en banc improvidently. The panel opinion of June 3, 1977, as amended August 2, 1977, is hereby withdrawn and the following opinion is substituted.

Batts and one Michael Heiges were charged in a two-count indictment with the importation of hashish in violation of 21 U.S.C. §§ 952, 960(a)(1) and 960(b)(2) and 18 U.S.C. § 2 and for possession of hashish with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2. Mr. Heiges, not wishing to test the fact-finding process, fled the jurisdiction and is still at large. Batts was tried by a jury and was convicted on both counts. Batts appeals and we affirm.

The sole issue presented for review is whether it was error to allow the government to introduce, in its rebuttal case, evi-

* Honorable Robert Van Pelt, Senior United States District Judge, District of Nebraska, sitting by designation.

dence of prior criminal activity of the appellant.

The facts taken in the light most favorable to the government reveal that Batts and Heiges arrived in Heiges' El Camino truck at the port of entry near Lynden, Washington. A subsequent search at the port of entry disclosed 15 bricks of hashish hidden in the wall of the truckbed. The concealed compartment in the wall of the truckbed was covered by a metal plate secured by phillips head screws. A set of tools which contained numerous phillips head screwdrivers was also found in the truck.

A detailed account of what occurred at trial is necessary to understand how the issue unfolded. Immigration Inspector Bunch, the initial inspection officer on the scene, was the first witness to testify. He testified that after asking the routine preliminary questions, he inspected the interior of the El Camino and found marijuana seeds. He then directed the truck to the secondary search area. He testified that the two occupants were "overly nervous and overly helpful." (R.T. 9) He then testified as to the occurrences surrounding the search and eventual discovery of the hashish. He also testified that he had discovered the set of tools in the bed of the El Camino.

The next person to testify was Customs Inspector Barnes. He testified that since he owned an El Camino and was familiar with its construction, he assisted Officer Bunch in his search of the vehicle. He testified as to his discovery of the hashish in the concealed compartment in the wall of the truckbed. He testified that appellant had told him that the set of tools found belonged to appellant. He testified that he had personally searched appellant and found a silver trinket around appellant's neck. He testified that appellant told him it was a coke spoon.[1] At this time, Exhibit 10, the coke spoon, was admitted without objection. He testified further as to comments by appellant regarding the "luckiness" of the search[2] and to appellant's requests for photos of the hashish.[3]

The next witness pertinent to our discussion was DEA Agent McClary. He testified that during his interview of appellant, appellant told him he was the driver of the vehicle. He also testified that Mr. Heiges did not have a valid driver's license. DEA Agent Brant was next to testify and he testified as to the chain of custody of the coke spoon and how the coke spoon was used. All of this testimony was adduced without objection. Upon the conclusion of his testimony, the government rested.

The first witness to testify for the defense was the appellant. He testified as to his personal history and background, including his family situation, education, and employment record. He identified the box of tools and testified that they were his, and that he did not permit anyone to use his tools unless he was personally present. He testified as to his acquaintanceship with Mr. Heiges and the reasons why he accompanied him on the trip to Canada. He described the sojourn into Canada and denied that he was driving the El Camino when it arrived at the port of entry. He also testified that he asked Inspector Barnes if the

1. "Q. And what did you do or say at that time?
   A. (Mr. Barnes) I said that it looks like a coke spoon. He (appellant) said it was." (R.T. 47)

2. "A. (Mr. Barnes) . . . and he asked me was it just lucky that I found the drugs where I did, and I told him that not necessarily lucky, that we do look especially on certain cars that have compartments similar to that of the El Camino." (R.T. 49)

3. "A. (Mr. Barnes) . . . and he started taking pictures of the drugs, and Mr. Batts asked if that was a newspaper man or a photographer from the newspaper, and I told him it wasn't because that was a Customs officer, and I told the port director that I would like to have some pictures of the seizure myself, and if any of them came out, Mr. Batts said he would like to have some of the pictures."

discovery of the hashish was just lucky,[4] and that he had requested photos of the seizure.[5] Appellant also denied any knowledge that the hashish was hidden in the car.[6]

During cross-examination, and without objection, the following colloquy took place:

"Q. You are being handed No. 10, the spoon; what is that, Mr. Batts?

A. That's a necklace that was given to me by my girlfriend.

Q. And what is it supposed to be?

A. Well, I used it for cleaning the dirt out from under my fingernails. I don't know what they use it for.

Q. You don't know what it is?

A. Well, I had an idea when they were asking me, 'Well, don't you use this for sniffing coke?' and I said, 'No, I do not.'

Q. Is what you are saying is that you didn't know before they said anything that that is commonly known as a coke spoon?

A. No, I did not.

Q. You had no knowledge about that?

A. No, sir.

Q. No knowledge about cocaine use, are you saying no?

A. No." (R.T. 135)

Appellant then called as a witness his girlfriend, who testified that she had received the coke spoon from a friend and had given it as a gift to the appellant. This friend also testified and corroborated the girlfriend's testimony.

On rebuttal, over appellant's objection, the government introduced evidence showing that appellant had offered and negotiated the sale of a large amount of cocaine to an undercover agent seven months previous to the incident in question. The eventual sale of cocaine did not result in a conviction as the cocaine was suppressed because of an admittedly illegal search and seizure, specifically a violation of the state's no-knock rules.[7] The trial

---

4. "Q. Did you also make some inquiry as to whether they had some information that they were going to find some drugs or whether it was just dumb luck or something like that?

A. Well, I asked him what the deal was because like we were almost ready to go through, and I was just about ready to get back in the car when they found it and started checking back there, and I didn't know what was going on, I didn't even know what they had found until the DEA agent told me." (R.T. 118–119)

5. "Q. And at that time did you make any inquiry of the man who made the pictures or anybody else in his presence?

A. Yes, I asked him if I could have a photograph because no one would believe me if I told them what happened." (R.T. 118)

6. "Q. All right. Now with respect to the incident at the border and the government agents finding this hashish in the '66 El Camino, did you know that that quantity or any quantity of drugs was inside the panel of that particular truck?

A. No, I did not." (R.T. 119)

7. In this case we are not confronted with the issue addressed in *United States v. Trejo*, 501 F.2d 138 (9th Cir. 1974), which dealt with the applicability of the exclusionary rule where illegally-seized evidence was offered to impeach (by contradiction) the defendant after he had denied, on cross-examination, owning the items that were illegally seized. The rebuttal evidence in this case was not illegally seized. The rebuttal evidence consisted solely of testimony about the offer and negotiations between appellant and the undercover agent which occurred prior to the no-knock violation. As such, this evidence is not tainted by the subsequent illegal search and seizure which resulted in the suppression of the cocaine. Had the illegally-seized cocaine been admitted, *United States v. Trejo, supra*, would apply unless enactment of the Federal Rules of Evidence lessens its validity. However, this issue has not been raised here and we express no opinion. However, in this case the suppressed cocaine was offered but was immediately withdrawn; therefore there was no illegally-seized evidence admitted in this case. Additionally, we do not think that the jury's viewing of the two cocaine exhibits, which were labeled and identified by the undercover agent while he was on the stand, was prejudicial. As stated, the exhibits were withdrawn immediately and never admitted into evidence and the admissible testimony of the agent clearly focused on the fact that the subject of the negotiations involved cocaine. The mere viewing of these exhibits did not inform the jury of something new; they knew it was a cocaine transaction and this fact was never denied; the error, if any, was harmless.

court firmly instructed the jury that such evidence was admissible only to impeach appellant's credibility and to show knowledge and intent.

■ We believe that this evidence was admissible under Rule 404(b), Federal Rules of Evidence, which allows evidence of such acts to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See also United States v. Marshall*, 526 F.2d 1349, 1360–61 (9th Cir.), *cert. denied*, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976). The comments of counsel and the trial court clearly demonstrate that such evidence was directed at appellant's claimed lack of knowledge.[8]

In deciding whether to admit this evidence under Rule 404(b), the trial court also had to make the determination as to whether the danger of undue prejudice outweighed the probative value of the evidence as required under Rule 403, Federal Rules of Evidence. Our review of the record convinces us that the trial court properly struck the balance in favor of admitting the evidence.

■ In this case the rebuttal evidence consisted of prior activity in drugs, albeit a different drug. The connecting factor between the crime charged here and the rebuttal evidence is the fact that the crime here charges an intent to distribute (hashish) and the rebuttal evidence discloses acts of negotiation leading up to an act of distribution. Merely because the drugs involved are different does not strip this conduct of its evidentiary value. The past acts of negotiation leading to the distribution of one drug is relevant to show knowledge, motive and intent on the part of appellant to partake in the attempt here to import commercial quantities of yet another drug for the purposes of distribution. The relevant factor is the type of activity undertaken, not the identity of the drugs. *United States v. Perez*, 491 F.2d 167 (9th Cir.), *cert. denied*, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974); *United States v. Rivera*, 437 F.2d 879 (7th Cir. 1971). In light of appellant's claimed lack of knowledge of cocaine, the uses of the coke spoon and the existence of the hashish in the El Camino, we believe that the probative value of this evidence showing appellant's true knowledge and involvement in drug activities clearly outweighs any prejudicial effect.

■ It must also be remembered that the admissibility of rebuttal evidence is subject to the sound discretion of the trial court. *United States v. Perez, supra.* Great deference must be accorded to this discretion and the judgment of the trial court. He was present and able to observe appellant's manner and demeanor on the stand. Our review of the cold record discloses to us that the general tenor of appellant's testimony was a portrayal of one completely naive about drugs. The trial judge was in the best position to evaluate the effect this mis-painted picture had on the jury. By admitting the rebuttal evidence, the trial court merely permitted completion of the picture as to appellant's true involvement and knowledge in the drug world and thereby corrected a distorted view of appellant's testimony and his attempts to portray naivety.

AFFIRMED.

KENNEDY, Circuit Judge, dissenting:

The principal issue of the case in its present posture concerns application of the

---

**8.** The prosecutor stated:

"MR. MAIR: Again in light of Mr. Batts' flat denial of any knowledge of cocaine, I would introduce—seek to introduce testimony of officers who would testify that Mr. Batts offered and negotiated a cocaine sale with them before this event." (R.T. 149)

The trial court's eventual response was:

"THE COURT: . . . Frankly, I was going to rule with Mr. Guterson on this until the testimony of Mr. Batts. He stated that he didn't know—had no knowledge about cocaine use, no knowledge about the use of this spoon. He also testified, and this response kind of slipped by, he testified that he really didn't know what this was, and I'm speaking of the spoon, speaking of the hash, until later, and he found out what this substance was." (R.T. 151–52)

rule in *Trejo v. United States*, 501 F.2d 138 (9th Cir. 1974), to evidence of the defendant's prior criminal acts. I agree with the majority's statement of the rule, but disagree with the manner in which the majority applies it to the facts here. The question is whether or not illegally-seized evidence was considered by the jury. Since I believe that the jury did consider such matters, I respectfully dissent.

After the close of the defendant's case, the Government offered a single rebuttal witness, detective Stokke, who testified that on an earlier occasion he had seized three bags of cocaine from the defendant. The majority concedes that "[h]ad the illegally-seized cocaine been admitted, *United States v. Trejo, supra,* would apply . . ," but decides that the cocaine exhibits were withdrawn and that the rebuttal evidence "consisted solely of testimony about the offer and negotiations between appellant and the undercover agent which occurred prior to [the illegal seizure]." (majority opinion at n.7 *supra*).[1] I find no support in the record for that determination.

The concluding and somewhat dramatic testimony on which the Government rested its case is best understood by direct quotation, and is set forth in the margin.[2] It is immediately apparent that the laboratory analysis of the bags' contents was critical evidence. The scientific identification of the contents as cocaine was of primary relevance to the detective's testimony, quite apart from the exhibition of the bags themselves. The testimony as to the laboratory analysis was never withdrawn; the jury was not instructed to disregard it; and the prosecution rested immediately when that testimony was given, no doubt to underscore its importance. I fail to understand how the majority can construe this testimony as anything other than a direct reliance upon evidence that resulted from an unlawful seizure.

Although it is thus incorrect for the majority to draw any comfort from its determination that the exhibit consisting of the three bags of cocaine was withdrawn, that determination is also unsupported by the record. The prosecutor stated: "I move the admissibility of 14. I withdraw that." The word "that" is ambiguous, but two lines later the reporter interpreted the reference to pertain to exhibit 15, which was a glass vial containing cocaine, not the three bags. This interpretation by the court reporter is repeated in the index to the transcript, which shows that exhibit 14 (the three bags) *remained in evidence* and that only exhibit 15 (the glass vial) was withdrawn.

I therefore cannot agree that integration of the illegally-seized evidence into this trial was somehow cured by the subsequent withdrawal of the exhibit. I conclude that it was error to permit the jury to consider either the evidence that pertained to the

---

1. The majority suggests that enactment of the Federal Rules of Evidence may have undermined the rule in *Trejo.* My objections to that reasoning are fully set forth in a dissent from an opinion of the panel which was later withdrawn. *United States v. Batts,* 558 F.2d 513, 519 (9th Cir. 1977). The text of that dissent is here incorporated by reference.

2. Q. [Prosecutor:] All right. What happened then?

A. [Stokke:] Then the surveilling officers entered the house and we effected the arrest on the individuals.

. . . . .

Q. Did you seize the white powder?

A. Yes, I did.

Q. And Plaintiff's Exhibit 14, what is in that package?

A. Three clear plastic bags of white powder.

Q. And are those the ones you transacted on?

A. Yes.

Q. Plaintiff's Exhibit 15 is what?

A. This is one glass vial with a small amount of white powder in it.

Q. And was that a part of that negotiation?

A. No, it was not.

[Prosecutor]: Your Honor, we strike 15.

THE COURT: All right. It will be stricken.

Q. [Prosecutor:] Now, was that white powder submitted to laboratory analysis?

A. It was.

Q. And did it remain in your custody until it was—

A. Yes, it was.

Q. All right. And what was the white powder?

A. The white powder was analyzed as cocaine.

(R.T. at 176–78).

contents of the bags or the tangible evidence consisting of the bags themselves. The argument of the majority that evidence of possession of the cocaine is merely cumulative to the testimony of the detective is unconvincing. Possession of cocaine is far more material to the issue in this case than would be uncorroborated testimony concerning an offer to sell. Since I cannot conclude that either error was harmless beyond a reasonable doubt, *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), I would reverse the conviction.