Filed 7/28/22  P. v. Torres CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VENTURA TORRES,<br><br>Defendant and Appellant. | 2d Crim. No. B314611<br>(Super. Ct. No. KA113626)<br>(Los Angeles County) |

Ventura Torres appeals the judgment entered after a jury convicted him of first degree willful, deliberate and premeditated murder (Pen. Code,[1] §§ 187, subd. (a), 189).  The trial court sentenced him to 25 years to life in state prison.  Appellant raises claims of insufficient evidence and evidentiary, prosecutorial, and cumulative error.  We affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

## STATEMENT OF FACTS

Appellant and victim Kassandra Salvador began dating in 2010. In 2013 or 2014, appellant began living with Salvador and her parents Cecelia and Marido. Appellant was given his own keys to the residence, which is equipped with video surveillance cameras and a security door that required the use of two different keys.

In July 2016, appellant moved out of Salvador's house at her request because she "need[ed] space." Salvador subsequently began dating her coworker David Ortiz but maintained contact with appellant. On one occasion, Salvador and Ortiz were sitting in Salvador's vehicle across the street from Ortiz's residence when appellant parked nearby in his blue Ford Focus. On another occasion, Salvador and Ortiz were sitting on a bench outside Ortiz's house when Ortiz saw a blue hatchback in the intersection that looked like appellant's vehicle. Ortiz asked Salvador if the global positioning service (GPS) setting on her phone was on and she was being followed. Salvador discovered that her GPS setting was activated and Ortiz told her to turn it off.

On the evening of September 17, Salvador and Ortiz finished their work shifts and smoked marijuana together. Before they went their separate ways, Salvador told Ortiz she was going to the beach to relax. At 10:30 p.m., Salvador and Ortiz communicated via text messages about their evening.

Instead of going to the beach, Salvador drove to the apartment where appellant was living with his sister and mother. At 7:46 p.m., they recorded a sex video. As depicted on video surveillance cameras, appellant and Salvador subsequently went to a liquor store and take-out restaurant and then returned

to appellant's apartment. Salvador left at approximately 10:15 p.m., arrived at her residence at approximately 10:35 p.m., and immediately entered the house and went upstairs.

At 10:34 p.m. appellant left his apartment, drove his mother's car to a street near Salvador's house, and parked. A neighbor's surveillance video shows appellant walking towards Salvador's house and arriving at her vehicle. Appellant remained in or near the vehicle for about 15 minutes, then walked back to his mother's vehicle and drove back to his apartment complex. Instead of driving into the complex's parking lot, he parked outside on the street.

At about 2:49 a.m., appellant returned to his mother's car and drove back to the vicinity of Salvador's house. As before, he parked on a different street and walked to the residence. This time appellant entered the locked residence with his keys, went up the stairs to Salvador's locked bedroom (which he also opened with his keys), and entered the room at approximately 3:43 a.m. Appellant had a black sock on one foot, a white glove on one hand, and was holding what appeared to be another black sock in his other hand. At 4:38 a.m., while appellant was still in Salvador's room, he used her phone to send Cecelia a text message stating "I gotta get to work early today."

At 4:41 a.m., appellant left the house carrying Salvador's purse. He went to Salvador's car, drove it for approximately half a mile, then parked and abandoned it. At 7:39 a.m., he arrived back at his apartment complex in his mother's vehicle.

At approximately 8:40 a.m., Cecelia went to Salvador's bedroom and unlocked the door to make sure she had not left any lights on. Salvador was lying on the bed on her back and was not breathing. Cecelia administered CPR while Marido called 911.

Salvador was declared dead after paramedics arrived. Although Salvador did not have any immediately visible injuries when her body was discovered, an autopsy subsequently revealed she had been strangled to death. A broken nail from Salvador's left ring finger was found on the floor near her body. Her vehicle was found later that day about a half-mile away.

Appellant was first interviewed by detectives at the police station later that same day. He told the detectives that he and Salvador were separated but were "just taking a break from each other." He also said that neither of them was seeing anyone else during this period of separation and claimed he was unaware of Salvador's relationship with Ortiz. He also recounted that Salvador had visited him at his apartment the prior night and that they had sex, but denied going to her house. He claimed that he never had the keys to Salvador's house, even when he lived there. When asked about a scratch on his neck that looked "fresh," appellant claimed he had gotten it while playing with his one-year-old niece a few days earlier. After appellant agreed to be photographed and have his fingernails scraped, he removed his shirt and revealed that he also had three scratches on his chest.

When appellant was interviewed again two days later, he acknowledged driving to Salvador's house shortly after she left but claimed he only did so to ensure she made it home safely. Appellant also revealed that he had scratch marks on his buttocks, which he claimed to have received while having "rough sex" with Salvador. After reviewing appellant's Facebook account, detectives discovered a conversation in which appellant had asked Diana Rafael if she knew Ortiz since he was on her friend list. After Rafael responded that she did not know

4

anything about Ortiz, appellant replied that he was "trying to do some investigation." Appellant asked Rafael to keep their conversation confidential and she assured him she would do so.

When appellant was interviewed for a third time, he was shown surveillance video of the perpetrator's face. Appellant offered that one of Salvador's friends had told him she "hang[s] out with somebody . . . that looks like me." He also claimed that after he had followed Salvador home earlier in the night he returned to his apartment and remained there until approximately 8:00 a.m. the next morning. When confronted with the surveillance video showing him leaving the apartment complex at approximately 2:49 a.m., he replied that he "might have" gone on a walk but did not remember doing so. He then added that he drove out of the complex and "just parked somewhere" and fell asleep until he was awakened by his cell phone alarm. Appellant also claimed he had returned the keys to Salvador's house, contradicting his prior statement that he never had the keys.

Appellant was arrested and a DNA sample was taken. A DNA sample was also obtained from Ortiz in January 2018. The fingernail found in Salvador's room was tested and found to contain a mixture of DNA from three contributors. Salvador and Ortiz were identified as possible contributors, but appellant was excluded. Appellant and Salvador were determined to be contributors of a mixture of DNA found on the other fingernails on Salvador's left hand, while Ortiz was excluded. Appellant was also determined to be a possible contributor of DNA found on Salvador's cell phone.

An expert in cellular telephone analysis and site mapping testified that appellant's cell phone connected to towers near

5

Ortiz's residence on five separate dates from August 29 to September 14, 2016. Appellant and Salvador's phones both connected to cell towers near Ortiz's house from 11:30 a.m. to 11:51 a.m. on September 1, 2016, from 11:04 p.m. to 11:51 p.m. on September 6, 2016, and at 9:42 a.m. on September 7. Appellant's phone also connected to towers near Salvador's home at 11:03 and 11:04 p.m. on the night of the murder.

## DISCUSSION

### I.

### *Sufficiency of the Evidence*

Appellant contends that his conviction of willful, deliberate, and premeditated murder must be reversed because the evidence is insufficient to prove he acted with premeditation. We are not persuaded.

In reviewing claims of insufficient evidence, we "'"'must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'"'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054-1055.) We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Ibid.*)

Appellant was convicted of first degree willful, deliberate and premeditated murder. "'"In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed

6

or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."'" [Citation.] "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citation.]' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

Our Supreme Court has identified three categories of evidence relevant to establishing deliberation and premeditation. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27; *People v. Brooks* (2017) 3 Cal.5th 1, 58-59; *People v. Houston* (2012) 54 Cal.4th 1186, 1216.) The categories include events occurring before the killing that indicate planning, motive to kill, and manner of killing that reflects a preconceived design to kill. (*Anderson*, at pp. 26-27.) The factors are neither exclusive nor invariably determinative. (*Brooks*, at p. 59; *Houston*, at p. 1216.) Evidence of each category is not required to affirm a judgment of first degree murder. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.) The factors are merely a guide in determining whether the evidence supports an inference that the killing occurred as a result of preexisting reflection rather than a rash impulse. (*Brooks*, at p. 59.)

The evidence is sufficient to support the jury's finding that appellant acted with premeditation in murdering Salvador, i.e., that he "acted deliberately and according to a 'preconceived design' rather than from a rash impulse." (*People v. Brooks*, *supra*, 3 Cal.5th at p. 59.) Appellant's assertions to the contrary

disregard the standard of review, which requires us to view the evidence in the light most favorable to the judgment. (*People v. Nguyen*, *supra*, 61 Cal.4th at pp. 1054-1055.)

Several hours prior to the murder, appellant drove to a street near Salvador's house, parked, and walked to the residence to see if her car was there. When he returned a few hours later he parked on a different street, took off his shoes, covered his hands with gloves and a sock, and attempted to obscure his face from video surveillance cameras. When he arrived at the residence, it took him approximately 90 seconds to unlock the front doors. He then entered the house, walked upstairs, and used his key to unlock Salvador's bedroom door. This planning activity supports the finding that appellant acted with premeditation. (*People v. Morales*, *supra*, 10 Cal.5th at p. 89; *People v. Disa* (2016) 1 Cal.App.5th 654, 665.)

Prior to the murder, appellant also followed Salvador and repeatedly called and texted her because he was jealous she was romantically involved with someone else. He also told his sister he was distraught over Salvador's involvement with Ortiz and began investigating Ortiz. This evidence demonstrates that appellant had a motive for the killing. (See, e.g., *People v. Brooks*, *supra*, 3 Cal.5th at pp. 59-60 [evidence of motive sufficient where defendant monitored victim's whereabouts and suspected she was "cheating on him"]; *People v. Disa*, *supra*, 1 Cal.App.4th at p. 666 [motive established by evidence that defendant was jealous and depressed about the end of his relationship with the victim and her involvement with someone else].)

The manner of killing—a strangulation—also plainly supports the jury's finding of premeditation. (*People v.*

8

*Quintanilla* (2020) 45 Cal.App.5th 1039, 1064; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 10-11.) Moreover, after strangling Salvador appellant took her purse, drove her car away, and sent her mother a text from Salvador's phone in an effort to delay the discovery of her body. These actions indicate that appellant was "not possessed by a sudden rage, but was acting in the course of [a] premeditated killing[]." (*People v. Cage* (2015) 62 Cal.4th 256, 277.) Appellant's claim that the evidence is insufficient to prove he committed a premeditated killing thus fails.

## II.

### *Exclusion of Evidence*

Appellant contends the trial court erred in excluding evidence that Salvador's parents were unable to identify him in a screenshot of surveillance video from their residence. He also faults the court for granting the prosecution's motion to exclude the testimony of a proposed defense identification expert.

Trial court rulings on the admissibility of evidence are reviewed for an abuse of discretion. (*People v. Thomas* (2021) 64 Cal.App.5th 924, 970.) Under this standard, "'a trial court's ruling with not be disturbed, and a reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) As we shall explain, no such showing is made here.

#### a. *Non-identification Evidence*

When Salvador's parents were separately interviewed by the police, each was shown a screenshot taken from surveillance video depicting a person wearing a hoodie. Cecelia said she "did

not recognize the person in the photo" and added "I don't think that's [appellant], because [his] hair is different." Marido said he "did not know who was depicted in the photograph." After appellant was arrested, detectives told Salvador's parents that appellant "obviously looks like the person in the video." When Salvador's parents were subsequently shown the surveillance video from which the screenshot was taken, the detectives asked if "that look[s] like somebody you know by the way he walks." Both parents then positively identified appellant as the individual depicted in the video.

Prior to trial, appellant moved to exclude Cecelia and Marido's identifications of appellant on the ground they were the result of an unduly suggestive procedure. Defense counsel asserted, however, that the evidence of Cecelia and Marido's inability to identify appellant from the screenshot was not "tainted" by the suggestive procedure and was thus admissible.

Following a hearing, the court concluded that the entire identification procedure was unreliable and unduly suggestive and that "either all of the identifications come in or none of them come in." The court reasoned that initially showing Salvador's parents a screenshot rather than the video affected the reliability of the information elicited (i.e., their inability to identify appellant), such that the showing of the screenshot and video were "tied part and parcel." Accordingly, the court excluded all of the evidence relating to Cecelia and Marido's identification of, or inability to identify, appellant as the person depicted in the images they viewed.

The court did not abuse its discretion. The non-identification evidence relating to the screenshot, which the court accurately characterized as "not a great picture" and "not a fair

10

photo," was inadmissible hearsay. (See Evid. Code, § 1200, subd. (a); *People v. Cuevas* (1995) 12 Cal.4th 252, 263.)[2] As the People note, the evidence was not admissible as lay opinion testimony because the jurors were capable of reviewing the surveillance videos and deciding for themselves whether appellant was the individual depicted therein. (See *United States v. Jadlowe* (1st Cir. 2010) 628 F.3d 1, 24.) The court also noted it would be incongruous to place Cecelia and Marido in the position of testifying that they could not identify appellant from a screenshot, yet preclude them from testifying that they were able to identify him in the surveillance video from which the screenshot was taken.

Appellant's citations to *People v. Gordon* (1990) 50 Cal.3d 1223, and *Bennett v. State* (Miss. Ct. App. 2000) 757 So.2d 1074, are unavailing. *Gordon* involved two separate identification procedures that were unconnected to each other, while *Bennett* involved a single viewing of a video recording. (*Gordon*, at pp. 1242-1243; *Bennett,* at pp. 1075-1077.) Here, the trial court did not abuse its discretion in finding that the identification procedure involving the screenshot was "tied part and parcel" to the identification procedure involving the video.

For the first time on appeal, appellant also claims that the court's ruling forced him to surrender one constitutional right for the assertion of another and violated his constitutional right to a defense. These claims were not raised below and are thus

---

[2] Although the trial court did not exclude the evidence as inadmissible hearsay, it is well-settled "'" that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason."'" (*People v. Turner* (2020) 10 Cal.5th 786, 807.)

forfeited. (*People v. Brooks*, *supra*, 3 Cal.5th at p. 50.) In any event, "the routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957.)

Even if the court had erred in excluding the non-identification evidence, the error would be harmless. As we have noted, the jurors could observe the video evidence and decide for themselves whether appellant was the individual depicted therein. Moreover, the independent evidence of appellant's guilt was overwhelming and appellant's attempts to demonstrate otherwise are unavailing. Any error in excluding the evidence that Cecelia and Marido could not identify appellant from the screenshot of the video surveillance was thus harmless regardless of the standard of review.

### b. *Proposed Defense Identification Expert*

Prior to trial, the prosecution moved to exclude the testimony of Dr. Roger La Jeunesse, Ph.D., a proposed expert witness for the defense. La Jeunesse's curriculum vitae, a draft of his report entitled "Video Analysis of Surveillance Video," and attachments to the report were included as exhibits. La Jeunesse, a retired anthropology professor, stated in his draft report that he had compared certain images from the surveillance video with a frontal photograph of appellant, appellant's booking photograph, and five photographs taken by his attorney. La Jeunesse acknowledged that comparing images from surveillance cameras, which use infrared (IR) wavelengths rather than visible light, with photographs is "subject to potential discrepancies" including "'IR haze,' in which the outline[] of the object/person surveilled is less distinct." Notwithstanding these issues, La Jeunesse opined that some features in the surveillance images

could be used for comparison, including "the relative width of the alae" as "compared with the overall length of the nose, the shape or contour of the apex," and whether the nostrils were visible "when the subject's head is deflected downward." After making these comparisons, La Jeunesse opined that appellant's nose did not match that of the person depicted in the surveillance video.

At the Evidence Code section 402 hearing on the prosecution's motion, La Jeunesse testified that his area of specialty was "forensic anthropology" in which he identified human remains by analyzing "images, photos, [and] pictures for purposes of identification." Although he had received no training in lighting or video surveillance technology, he asserted that "images of the face is [*sic*] an anthropologic issue." Here, La Jeunesse took seven frames from the surveillance video to compare to the still photographs of appellant. He then devised a "nasal index" showing the relative width of the individual's nose compared to its length, "the apex . . . [and] tip of the nose," and "the degree to which the nostrils flared" when viewed from the front. After comparing the images, La Jeunesse opined that appellant's nose was inconsistent with the nose of the individual depicted in the surveillance video. He acknowledged that the images taken from the surveillance video were blurry, yet offered that "it's the nature of the game I'm working with."

Under cross-examination by the trial court, La Jeunesse conceded that he had not compared two of appellant's photographs to determine if they had the same nasal proportions or ratios even though the depicted angles of the face were different. La Jeunesse went on to concede that due to "error" the ratios he identified for each of the seven photographs were not the same.

13

La Jeunesse also agreed that in one of the photographs appellant's nose appeared "very short because [his] head is down," while in another photograph his nose looked "very long because the face is up." He did not answer when asked if he could tell whether the person depicted in the two photographs was the same person based on the nasal ratios, but conceded that the ratios would "have to be the same" to validate a comparison to other images. He also acknowledged that he had no idea if or how the type of lens on a camera might affect facial contours or proportions, and that there was a "possibility" the camera's lens could have such effects. La Jeunesse agreed with the court that the images derived from the surveillance video were small and "highly pixilated." He also conceded that he could not see the edge of the individual's nose in one of the image and was merely "speculating where they are [*sic*]."

At the conclusion of the hearing, the trial court granted the motion to exclude La Jeunesse's testimony. The court reasoned among other things that La Jeunesse had admitted he did not know whether a change in the camera lens would "affect the proportion, shape or contour of a nose, which was the entire basis of his opinion." The court also noted that La Jeunesse "could not indicate what the margin of error is or if one has ever been established related to these comparisons" and that he could merely state that the nasal propositions in the photographs of appellant were "probably" the same. The court further noted that the images taken from the video surveillance were too unclear to provide sufficient information regarding the shape and contour of the depicted individuals' nose, and that La Jeunesse had conceded he was unable to determine the width of the nose. The court found that "what [La Jeunesse] has relied upon and his

14

expertise and comparison are unreliable, speculative and he does not have the expertise and it does not rise to the level of being admissible."

The court did not abuse its broad discretion in excluding La Jeunesse's testimony.  (*People v. Tran* (2020) 50 Cal.App.5th 171, 185 (*Tran*).)  Expert testimony is admissible only if it involves a subject "'that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'"  (*People v. Eubanks* (2011) 53 Cal.4th 110, 140; Evid. Code, § 801.)  "'[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.' [Citations.]"  (*Tran*, at p. 185.)

The court properly exercised its gatekeeping function here by precluding La Jeunesse from testifying.  Indeed, La Jeunesse's proposed testimony failed on all three prongs.  The cases appellant cites in support of his claim to the contrary are inapposite.  The experts in those cases either manipulated, enhanced, or otherwise edited the subject images to make them easier for the jury to view, or provided insight into how the recording medium (video versus photograph) portrayed an individual given the circumstances in which the image was recorded.  (*Tran, supra*, 50 Cal.App.5th at pp. 187-189; *United States v. Alexander* (5th Cir. 1987) 816 F.2d 164, 168; *United States v. Sellers* (4th Cir. 1977) 566 F.2d 884, 886; *United States v. Cairns* (9th Cir. 1970) 434 F.2d 643, 644.)  La Jeunesse's proposed testimony essentially contemplated the comparisons of images and photographs, a task that is well within the abilities of

15

the average juror.  (*United States v. Dorsey* (4th Cir. 1995) 45
F.3d 809, 815; *United States v. Trejo* (9th Cir. 1974) 501 F.2d 138,
143.)  Appellant's claim for the first time on appeal that the
court's ruling violated his constitutional right to present a
defense is forfeited and in any event lacks merit.

It is also clear that any error in excluding La Jeunesse's
testimony would not compel reversal.  The evidence of appellant's
guilt was overwhelming, and the jurors were capable of
comparing the images and photographs to determine for
themselves whether appellant was the individual depicted in the
video surveillance images.  Accordingly, any error in excluding
the testimony was harmless regardless of the standard of review.

**III.**

### *Detective Shepherd's Testimony Regarding Ortiz*

Appellant contends the court erred in allowing Los Angeles
County Sheriff's Detective Chaffey Shepherd, one of the lead
detectives in the case, to testify he did not believe that Ortiz had
committed the murder.  We are not persuaded.

In cross-examining Detective Shepherd, defense counsel
asked a series of questions regarding the detective's investigation
of Ortiz as a potential suspect in the case.  On redirect, the
prosecutor began by stating she would begin her questioning of
Detective Shepherd "essentially where the defense left off."  The
prosecutor then asked the detective, "[H]ave you ever during the
course of this investigation up until the point where you're sitting
here on the witness stand today suspected David Ortiz of
committing this crime?"  After the court overruled appellant's
relevance objection, Detective Shepherd replied "I still do not
believe David Ortiz did this crime" and answered "no" when
asked if he had ever believed so.  The detective went on to testify

16

that after reviewing Salvador and Ortiz's phone records and interviewing appellant, he found no evidence that Ortiz had keys to Salvador's residence, had ever been inside the residence, or had exhibited obsessive or stalking behavior.

The court did not err in allowing Detective Shepherd to testify that he did not believe Ortiz had murdered Salvador. Although it is well-settled that "[a] witness may not express an opinion on a *defendant's* guilt" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77, italics added), Detective Shepherd did not express any such opinion here. Moreover, a lay witness may "'testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony.'" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1254.) "A law enforcement officer's testimony regarding the focus of a criminal investigation is not considered inadmissible lay opinion." (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1027.)

As the People correctly note, the challenged testimony was relevant to explain Detective Shepherd's process in eliminating Ortiz as a suspect in the murder. In cross-examining Detective Shepherd, defense counsel focused on the facts that the detective did not interview Ortiz until eight days after the murder, did not collect a DNA sample from him until 2018, waited to interview Ortiz after his DNA was found on Salvador's broken fingernail, waited until July 2018 to obtain a warrant for Ortiz's phone records, and did not obtain Ortiz's phone until January 2020. Because this line of questioning suggested that Detective Shepherd had failed to sufficiently investigate Ortiz, the prosecution was entitled to have the detective explain why he had ruled Ortiz out as a suspect. (See, e.g., *People v. Bell* (2019) 7 Cal.5th 70, 99 [by questioning detective about his failure to test

17

possible blood found on car, the defense "opened the door" such that "the prosecution had a right to follow up and explain why testing would have been futile"].)  In light of the overwhelming evidence of appellant's guilt, it is also clear that any error in admitting the challenged testimony was harmless regardless of the standard of review.

## IV.

### *Prosecutorial Error*

In her opening statement, the prosecutor told the jury: "[Y]ou're not going to hear Kassandra come into this courtroom, take the stand and testify like you will other witnesses, but she will speak to you throughout this trial.  She's going to tell you through a journal entry that she had been with [appellant] for six years and she was conflicted after the six years about what she wanted to do with their relationship."  The prosecutor proceeded, without objection, to read several of Salvador's journal entries and text messages to the jury.  The prosecutor also told the jury, without any objection from the defense, that "[y]ou're going to hear [Salvador] tell you that the person who killed her was [appellant] by the scratches she left on his neck as she fought for her life."

For the first time on appeal, appellant contends the prosecutor committed reversible error by "purporting to speak in the victim's voice to accuse [appellant] of the murder."  Although he acknowledges the lack of any objection below, he asserts that any such objection would have been futile.  He offers  that "[o]nce jurors felt the emotional force of the channeling of the victim, it is doubtful that all 12 could have erased the effect from their memory and emotions, no matter how vehement an admonition the court might devise."  Assuming that the claim is forfeited,

appellant alternatively contends that his trial attorney's failure to object amounts to ineffective assistance of counsel.

We are not persuaded that an admonition would have been futile. "[T]he success of an admonition is not measured by whether the jury would be expected to forget the improper comment entirely, but instead whether the jury could be expected to apply the law properly despite that comment." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 737.) Moreover, we "presume that jurors follow instructions not to be swayed by sympathy or prejudice." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 861-862.) The challenged remarks were not so inflammatory that a timely objection would have been futile. (See *People v. Dennis* (1998) 17 Cal.4th 468, 518-519, and cases cited therein.) Accordingly, the claim is forfeited. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 919.)

We also reject appellant's claim that his trial counsel provided ineffective assistance by failing to object. To make such a showing, appellant must establish both deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674].) In adjudicating such a claim, courts "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Id.* at p. 697.)

To establish prejudice in this context, appellant bears the burden of showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*,

466 U.S. at p. 694; *People v. Centeno* (2014) 60 Cal.4th 659, 676.) Appellant makes no such showing. The court and the parties emphasized to the jury that counsels' statements and arguments were not evidence, and we presume the jury understood and followed the court's instructions to that effect. (*People v. Erskine* (2019) 7 Cal.5th 279, 303.) In light of the overwhelming evidence of appellant's guilt, any error arising from the prosecutor's challenged remarks is also harmless. (*People v. Fields* (1983) 35 Cal.3d 329, 363; *People v. Simington* (1993) 19 Cal.App.4th 1374, 1378-1379.)

## V.
### *Cumulative Error*

Appellant contends that the cumulative effect of the alleged errors compels reversal of the judgment. Because we reject each assignment of error, appellant's claim of cumulative error necessarily fails. (*People v. Avila* (2006) 38 Cal.4th 491, 608.)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.          YEGAN, J.

20

Victor D. Martinez, Judge
Superior Court County of Los Angeles

_____

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General and, Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.